[No. S069522. June 29, 2000.]

PETER ALAN KASLER et al., Plaintiffs and Appellants, v.
BILL LOCKYER, as Attorney General, etc., et al., Defendants and
Respondents.

474

476

**COUNSEL**

Benenson & Kates, Don B. Kates; Stephen P. Halbrook; Michel & Associates, Trutanich Michel, C. D. Michel; and Donald E. J. Kilmer, Jr., for Plaintiffs and Appellants.

Michael Patrick Murray for National Rifle Association of America as Amicus Curiae on behalf of Plaintiffs and Appellants.

Steven Silver for National Rifle Association, California Rifle & Pistol Association, Gun Owners of California, the Second Amendment Foundation

and Lawyers Second Amendment Society as Amici Curiae on behalf of Plaintiffs and Appellants.

Richard E. Gardiner and Steven Silver for Law Enforcement Alliance of America as Amicus Curiae on behalf of Plaintiffs and Appellants.

Dan Schultz for Law Enforcement Alliance of America, Congress of Racial Equality, Womens' Safety Alliance, Doctors for Integrity in Police Research, Prosecutors for Responsible Gun Ownership and Lawyers Second Amendment Society as Amici Curiae on behalf of Plaintiffs and Appellants.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Ronald A. Bass, Assistant Attorney General, Paul V. Bishop, Kevin Holsclaw, John A. Gordnier and Timothy L. Rieger, Deputy Attorneys General, for Defendants and Respondents.

Louise H. Renne, City Attorney (San Francisco), D. Cameron Baker, Deputy City Attorney, Owen A. Clemens; O'Melveny & Myers, John A. Crose, Jr., Robert C. Vanderet, Charles C. Lifland, Jennifer L. Isenberg: Mark D. Polston, Brian J. Siebel and Dennis A. Henigan for Center to Prevent Handgun Violence, California Police Chiefs' Association, California Peace Officers' Association, California State Sheriffs' Association and City and County of San Francisco as Amici Curiae on behalf of Defendants and Respondents.

---

## OPINION

**BROWN, J.**—In enacting the Roberti-Roos Assault Weapons Control Act of 1989 (Stats. 1989, ch. 19, § 3, p. 64; hereafter AWCA), the Legislature imposed restrictions on a class of semiautomatic firearms it characterized as "assault weapons." (Pen. Code, § 12275 et seq.)[1] The restrictions were necessary, the Legislature found and declared, because each of the semiautomatic firearms designated as an assault weapon had "such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings." (§ 12275.5.) It did not intend, the Legislature stressed, to place restrictions on weapons "primarily designed and intended for hunting, target practice, or other legitimate sports or recreational activities." (*Ibid.*)

Prior to amendment of the AWCA in 1999 (the 1999 amendments) (Stats. 1999, ch. 129, § 7 et seq.), semiautomatic firearms were designated as

---

[1]Unless otherwise indicated, all further section references are to the Penal Code.

assault weapons by (1) being listed by type, series, and model in section 12276, or (2) by being declared an assault weapon under a procedure set forth in section 12276.5. Under the latter procedure, which is commonly referred to as the add-on provision, certain superior courts, upon petition by the Attorney General, may be called upon to declare a firearm an assault weapon because of its essential similarity to a listed assault weapon. With its 1999 amendments to the AWCA, the Legislature took a third approach to designating assault weapons—defining them in section 12276.1, subdivision (a) in terms of generic characteristics, for example, a "semiautomatic, centerfire rifle that has the capacity to accept a detachable magazine" and also has a "pistol grip that protrudes conspicuously beneath the action of the weapon." (*Id.*, subd. (a)(1)(A), Stats. 1999, ch. 129, § 7.) It bears repeating that the 1999 amendments were additive in this respect. Neither the list method of designating assault weapons in section 12276 nor the add-on provision of section 12276.5 was abandoned or textually modified by the 1999 amendments. This case arose prior to the enactment of the 1999 amendments, and the parties agree that the 1999 amendments do not render the issues before us moot.

Plaintiffs challenged the constitutionality of the AWCA in a taxpayers' suit to enjoin its enforcement. The trial court sustained a demurrer without leave to amend except as to one cause of action, and when plaintiffs declined to amend, dismissed the action. The Court of Appeal reversed. It held the AWCA unconstitutional on the following grounds: (1) the section 12276 list of assault weapons violates principles of equal protection because it is irrationally underinclusive; (2) the add-on provision of section 12276.5 violates the separation of powers doctrine by delegating legislative power to the courts; and (3) the AWCA violates due process because it is unduly vague and fails to give advance warning of the conduct prohibited by it. We conclude the AWCA does not violate the equal protection or separation of powers doctrines and that the due process claim fails as a facial challenge to the AWCA. Accordingly, we reverse the judgment of the Court of Appeal. In the discussion that follows, we summarize the relevant provisions of the AWCA as we address each of plaintiffs' constitutional challenges. For the convenience of the reader, the full text of the relevant provisions of the AWCA as amended in 1999 may be found in the appendix.

## I. Discussion

### A. *Equal Protection*

In section 12276, the Legislature listed semiautomatic firearms— rifles, pistols, and shotguns—considered to be assault weapons, specifying

such firearms by type, series, and model. Plaintiffs contend the AWCA violates the principles of equal protection embodied in the state and federal Constitutions because the Legislature failed to include in the section 12276 list certain weapons that are identical to, or indistinguishable from, listed weapons. The short answer to this argument, the Attorney General contends, is that the equal protection clauses of the federal and state Constitutions protect *persons*. Guns are things, not persons. Therefore, equal protection principles do not protect guns from unequal treatment.

The Attorney General's analysis finds some support in two recent cases: *Benjamin v. Bailey* (1995) 234 Conn. 455 [662 A.2d 1226] (*Benjamin*), and *California Rifle & Pistol Assn. v. City of West Hollywood* (1998) 66 Cal.App.4th 1302 [78 Cal.Rptr.2d 591] (*California Rifle*). In *Benjamin*, the Supreme Court of Connecticut, in the course of considering various constitutional challenges to an assault weapons ban, stated: "The equal protection clauses of the federal and state constitutions apply only to 'persons.' [Citations.] The plaintiffs' challenge relates to classifications among weapons, not persons. . . . Accordingly, the plaintiffs have not raised a claim that falls within the scope of the constitutional guarantee they seek to invoke." (*Benjamin, supra*, 662 A.2d at pp. 1235-1237, fn. omitted.) In *California Rifle*, the Court of Appeal reached the same conclusion in upholding a city ordinance banning the sale of "Saturday Night Specials." "The general rule is that persons who are similarly situated in relevant respects must be treated equally by the law. Obviously, a handgun is not a person, and hence there is no constitutional compulsion for a state's laws to treat all handguns alike. . . . The equal protection clause simply does not protect guns from unequal legal treatment." (*California Rifle, supra*, 66 Cal.App.4th at p. 1326.)

Holding that only persons, not things, are protected from unequal legal treatment was something of a makeweight in both cases because the courts went on to consider and reject the equal protection challenges on the merits. (See *Benjamin, supra*, 662 A.2d at pp. 1237-1240; *California Rifle, supra*, 66 Cal.App.4th at p. 1329.) As the Court of Appeal in this case noted, the argument made by the Attorney General "overlooks the fact that it is the persons who make and own guns who are penalized." The Connecticut Supreme Court in *Benjamin* acknowledged this point in rejecting the equal protection challenge raised there. "Even if the plaintiffs' argument were construed as an allegation that *people* who possess a listed firearm are treated differently from *people* who possess an unlisted firearm, and that this disparate treatment violates principles of equal protection, the plaintiffs would not prevail on the merits of this claim." (*Benjamin, supra*, 662 A.2d at p. 1237.) Courts not uncommonly refer to issues of equal protection as

involving discrimination among things when they mean discrimination among persons having interests in those things. For example, in *Minnesota v. Clover Leaf Creamery Co.* (1981) 449 U.S. 456 [101 S.Ct. 715, 66 L.Ed.2d 659], a case that will be further discussed below, the United States Supreme Court characterized the controversy there as centering on "the narrow issue whether the legislative classification between plastic and nonplastic nonreturnable milk containers is rationally related to achievement of the statutory purposes." (*Id.* at p. 463 [101 S.Ct. at p. 723], fn. omitted.) We have used such shorthand ourselves. (See, e.g., *Cossack v. City of Los Angeles* (1974) 11 Cal.3d 726, 734 [114 Cal.Rptr. 460, 523 P.2d 260] [a ban on pinball games, were it intended to proscribe games of skill, would constitute a denial of equal protection of the laws, "since there would be an arbitrary discrimination against the limited number of games of skill falling within its terms"].)

■ The shortcut suggested by the Attorney General having turned out to be a blind alley, we must address plaintiffs' equal protection challenge on the merits, and the threshold question we confront is which standard of review applies. "In *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1 [112 Cal.Rptr. 786, 520 P.2d 10], we described the two principal standards or tests that generally have been applied by the courts of this state and the United States Supreme Court in reviewing classifications that are challenged under the equal protection clause of the Fourteenth Amendment of the United States Constitution or article I, section 7, of the California Constitution. As the court in *D'Amico* explained: 'The first is the basic and conventional standard for reviewing economic and social welfare legislation in which there is a "discrimination" or differentiation of treatment between classes or individuals. It manifests restraint by the judiciary in relation to the discretionary act of a co-equal branch of government; in so doing it invests legislation involving such differentiated treatment with a presumption of constitutionality and "requir[es] merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose." [Citation.] . . . Moreover, the burden of demonstrating the invalidity of a classification under this standard rests squarely upon *the party who assails it.*' (11 Cal.3d at pp. 16-17, italics in original.) [¶] The court in *D'Amico* further explained that '[a] more stringent test is applied . . . in cases involving "suspect classifications" or touching on "fundamental interests." Here the courts adopt "an attitude of active and critical analysis, subjecting the classifications to strict scrutiny. [Citations.] Under the strict standard applied in such cases, *the state* bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." [Citation.]' (11 Cal.3d at p. 17.)" (*Warden v. State Bar* (1999) 21 Cal.4th 628, 640-641 [88 Cal.Rptr.2d 283, 982 P.2d 154], fn. omitted.)

Although plaintiffs assert the AWCA fails to satisfy even the rational basis test, they contend it should be reviewed under the "intermediate or even strict scrutiny standards of legal review" because "portions of the [AWCA] touch upon [an] express fundamental constitutional right." This fundamental right plaintiffs locate in article I, section 1 of the California Constitution, which provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." If plaintiffs are implying that a right to bear arms is one of the rights recognized in the California Constitution's declaration of rights, they are simply wrong. No mention is made in it of a right to bear arms. (See *In re Rameriz* (1924) 193 Cal. 633, 651 [226 P. 914, 34 A.L.R. 51] ["The constitution of this state contains no provision on the subject"].) Moreover, "[i]t is long since settled in this state that regulation of firearms is a proper police function." (*Galvan v. Superior Court* (1969) 70 Cal.2d 851, 866 [76 Cal.Rptr. 642, 452 P.2d 930].) We reject any suggestion that the regulations at issue here impermissibly infringe upon the right to defend life or protect property guaranteed by the California Constitution.

Therefore, as the AWCA does not burden a fundamental right under either the federal or the state Constitutions, the rational basis test applies. (See *Peoples Rights Organization, Inc. v. City of Columbus* (6th Cir. 1998) 152 F.3d 522, 531-533; *Coalition of New Jersey Sportsmen, Inc. v. Whitman* (D.N.J. 1999) 44 F.Supp.2d 666, 685; *California Rifle, supra,* 66 Cal.App.4th at p. 1329; *Suter v. City of Lafayette* (1997) 57 Cal.App.4th 1109, 1133 [67 Cal.Rptr.2d 420]; *In re Evans* (1996) 49 Cal.App.4th 1263, 1270 [57 Cal.Rptr.2d 314].) This premise was challenged recently, insofar as the state Constitution is concerned, in *Warden v. State Bar, supra,* 21 Cal.4th 628. In *Serrano v. Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929], we had noted that "our state equal protection provisions, while 'substantially the equivalent of' the guarantees contained in the Fourteenth Amendment to the United States Constitution, are possessed of an independent vitality," and, "in a given case," we observed, the state provisions "may demand an analysis different from that which would obtain if only the federal standard were applicable." (18 Cal.3d at p. 764.) In *Warden,* a more sweeping question was raised—whether the rational relationship test adequately expresses the state constitutional guarantee. (*Warden v. State Bar, supra,* 21 Cal.4th at pp. 628, 660-667 (dis. opn. of Brown, J.) ["means scrutiny" is the appropriate test under the California Constitution].) The majority of this court, however, adhered to the rational relationship test and restated it as follows: "As both the United States Supreme Court and this court have explained on many occasions, '[i]n areas of social and economic policy, a

statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge *if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.* [Citations.] Where there are "plausible reasons" for [the classification] "our inquiry is at an end." ' (*FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 313 [113 S.Ct. 2096, 2101, 124 L.Ed.2d 211], italics added, quoting *U.S. Railroad Retirement Bd. v. Fritz* (1980) 449 U.S. 166, 179 [101 S.Ct. 453, 461-462, 66 L.Ed.2d 368]; see, e.g., *Central State Univ.* v. *American Assn. of Univ. Professors, Central State Univ. Chapter* (1999) [526] U.S. [124, 126-128] [119 S.Ct. 1162, 1163, 143 L.Ed.2d 227]; *Werner* v. *Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, 130-132 [216 P.2d 825, 13 A.L.R.2d 252].) Past decisions also establish that, under the rational relationship test, the state may recognize that different categories or classes of persons within a larger classification may pose varying degrees of risk of harm, and properly may limit a regulation to those classes of persons as to whom the need for regulation is thought to be more crucial or imperative. (See, e.g., *American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 371 [204 Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233]; *Williamson* v. *Lee Optical Co.* [(1955)] 348 U.S. 483, 489 [75 S.Ct. 461, 465, 99 L.Ed. 563] ['Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. [Citation.] Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.'].)" (*Id.* at pp. 644-645.)

 Mindful of the deference we must accord the Legislature under the rational basis standard, we review the circumstances giving rise to the AWCA. The crisis created by the proliferation and use of assault weapons was the subject of a session of the California State Assembly meeting as a Committee of the Whole on February 13, 1989. The purpose of the extraordinary session, Speaker of the Assembly Willie L. Brown, Jr., explained, was "to educate the entire membership of the California State Assembly" on the issue. (1 Assem. J. (1989-1990 Reg. Sess.) pp. 436-437.) "Ordinarily," Speaker Brown noted, "this would be done in a regular committee. On some occasions, when the issue is of such extraordinary importance, and of such immediacy, we [meet as] a Committee of the Whole." (*Id.* at p. 437.) Speaker Brown provided the context in which the regulation of assault weapons was being considered. "The shooting incident in Stockton, the drive-by shootings that have been going on in Southern California at an alarming rate, the number of police officers who have been the victims of semi-automatic weapons, and the 'stats' that now show the alarming group of arrests that are taking place, and when items are confiscated, on many, many occasions those items have turned out to be semi-automatic weapons.

A combination of all those things, plus the volume of editorials, the volume of public comment out there about the question, requires us to address the issues." (*Ibid.*)

The "shooting incident in Stockton" to which Speaker Brown alluded had occurred at the Cleveland Elementary School in Stockton, California, the month before the meeting of the Committee of the Whole. While 300 pupils, mostly kindergartners through third graders, were enjoying their lunchtime recess, Patrick Purdy, who had placed plugs in his ears to dull the sounds of what he was about to do, drove up to the rear of the school and stepped out of his car carrying a Chinese-made semiautomatic AK-47. "Impassively, Purdy squeezed the trigger of his rifle, then reloaded, raking the yard with at least 106 bullets. As children screamed in pain and fear, Purdy placed a 9-mm pistol to his head and killed himself. When the four-minute assault was over, five children, ages 6 to 9, were dead. One teacher and 29 pupils were wounded." (Chow, *Slaughter in a School Yard* (Jan. 30, 1989) Time, at p. 29.)

The shooting at the Cleveland Elementary School in Stockton was only the latest of a series of terrifying incidents in California involving assault weapons. Five years earlier, in San Ysidro, James Huberty drove to a McDonald's restaurant "after announcing casually to his wife, 'I'm going to hunt humans.'" (Griggs & Ysidro, *Sudden Death; Mass Murder at a McDonald's* (July 30, 1984) Time, at p. 90.) Stepping into the restaurant with a 9-millimeter Browning automatic pistol in his belt and a 12-gauge shotgun and a 9-millimeter UZI semiautomatic rifle slung over his shoulders, Huberty called out, " 'Everybody on the floor.' About 45 patrons were present. As they scrambled to comply, Huberty marched around the restaurant calmly spraying gunfire. . . . Maria Diaz ran out the side door in panic when the shooting started, then remembered that her two-year-old son was still inside. She crept back to a window and saw him sitting obediently in a booth. She motioned him toward the door, nudged it open, and the boy toddled to safety." (*Ibid.*) Not everyone was so fortunate. After SWAT sharpshooters finally killed Huberty, "police and hospital workers moved in on the gruesome scene. A mother and father lay sprawled across their baby, apparently in an attempt to shield it. All three were dead." (*Ibid.*) The carnage was clearly far worse than it would have been had Huberty not been armed with semiautomatic weapons. He fired hundreds of rounds. "The gunfire was so heavy that police at first assumed that more than one gunman was inside. A fire truck took six shots before reversing direction and backing off. One fire fighter was grazed by a bullet that tore through the truck and then landed softly on his head." (*Ibid.*) In all, of the 45 patrons in the restaurant, Huberty killed 21 and wounded 15 others.

In the hearing before the Committee of the Whole, the lead-off speaker was Attorney General John Van de Kamp. Attorney General Van de Kamp testified that only the day before a woman and her unborn child in Los Angeles had been killed by a gang member with an assault weapon. He added: "There was another one down in Lynwood, a nineteen-year-old, who was killed the same day." (1 Assem. J. (1989-1990 Reg. Sess.) p. 438.) Increasingly, "the weapons of choice for this madness," he noted, were "semi-automatic military assault rifles." In Los Angeles, he said, it had "become fashionable among hard-core members of the Crips Gang to spray a stream of bullets in hopes of taking down one rival gang member, but infants and grandmothers may be killed as well. They say that the young killers even have a phrase for it. They say, 'I spray the babies to [the] eighties.' " (*Ibid.*)

Because assault weapons were unregulated, Attorney General Van de Kamp observed, law enforcement officials did not know how many of them there were in California. However, he added, "we do know that the numbers are going up at a frightening rate. Hard hit police departments have begun to keep records, like Oakland, where the number seized has tripled in less than two years. Statewide, the number of semi-automatic weapons seized . . . by law enforcement has more than doubled in the last two years. . . . A partially completed Department of Justice survey with 132 law enforcement agencies reporting thus far has found the same pattern for semi-automatics actually used in crimes. The number has doubled in the last two years. The number used in shootings has gone up nearly 300%. Clearly, we are seeing an escalation in the arms race, and law enforcement is losing." (1 Assem. J. (1989-1990 Reg. Sess.) p. 439.)

Dr. Garen Wintemute of the University of California, Davis, Medical School appeared before the Committee of the Whole to testify with regard to the "special wounding characteristics" of the high velocity ammunition commonly used in assault weapons. (1 Assem. J. (1989-1990 Reg. Sess.) p. 447.) When a high velocity bullet enters the body, Dr. Wintemute explained, "it starts to 'tumble,' as it moves through the tissue . . . greatly increasing the amount of tissue which is damaged by direct contact with the bullet. Moreover, as this high-velocity missile travels through the tissue, it sends out pressure waves: We've all seen pictures of airplanes breaking the sound barrier, and waves moving away from the plane. The same thing happens as these bullets travel through tissue; these pressure waves . . . create what is called 'a temporary cavity' behind the path of the bullet, which may be 10 to 15 times—or even greater—the diameter of the bullet itself. [¶] As a result of this phenomenon, these high-velocity missiles can damage or destroy organs, break bones—including the femur, possibly the strongest bone in the body—without ever touching them." (*Ibid.*)

Lieutenant Bruce Hagerty, a Los Angeles police officer familiar with "gangs and the increasing use of assault weapons," also testified before the Committee of the Whole. (1 Assem. J. (1989-1990 Reg. Sess.) p. 450.) "Probably the most graphic example, for me, was on Good Friday of last year, where a rival gang entered a neighborhood in South Central Los Angeles and sprayed a crowd of forty to fifty people with an AR-15, and that's an American assault rifle, shooting 14 people, killing a 19 year old boy, hitting a five year old little girl, and a 65 year old man, and all ages in between. I was the field commander of that situation, and I'm here to tell you that that was, in every sense of the word, a war scene. . . . There were bodies everywhere and people were terrified, and the only reason that this gang did that was to terrorize the neighborhood because they wanted to take it over and be able to sell drugs in that neighborhood, and the military assault rifle is the vehicle that they used. [¶] . . . I'm here to tell you that there's only one reason that they use these weapons, and that is to kill people. They are weapons of war." (*Ibid.*)

The sponsors of the AWCA were Senator David A. Roberti and Assemblyman Mike Roos. Originally, both Senate Bill No. 292 (1989-1990 Reg. Sess.) (Senate Bill 292), introduced by Senator Roberti, and Assembly Bill No. 357 (1989-1990 Reg. Sess.) (Assembly Bill 357), introduced by Assemblyman Roos, defined assault weapons generically. As amended in the Senate on January 31, 1989, Senate Bill 292 defined "assault weapons" to include, for example, "[a]ll semiautomatic action, centerfire rifles that accept detachable magazines with a capacity of 20 rounds or more." The parallel provision of Assembly Bill 357, as amended in the Assembly on February 27, 1989, was identical. Although a majority in the Senate favored the approach of defining assault weapons generically, that approach was not acceptable to a majority of the Assembly. In the Assembly Public Safety Committee, the fate of Assembly Bill 357 was expected to turn on the vote of Assemblyman Charles W. Quackenbush, who was quoted as saying, "As it stands right now, I am against [the legislation]. There would have to be major changes for me to support it." According to the Los Angeles Times, "Quackenbush and other opponents say the bills would ban some legitimate hunting rifles as well as assault weapons and say they could support a measure that contained a more exact definition of assault weapons." (Ingram, *State Anti-Gun Measures Facing an Uncertain Fate*, L.A. Times (Feb. 24, 1989) p. I32, cols. 3-4.)

On February 28, 1989, Assembly Bill 357 was approved by the Assembly Public Safety Committee "with no votes to spare." (Ingram & Gillam, *Assault Gun Ban Gains in Legislature*, L.A. Times (Mar. 1, 1989) p. I1, col. 1.) The committee's action "followed acceptance by Roos of amendments

proposed by Quackenbush that eliminated a broad definition of what constituted an assault rifle. Substituted in its place was a list of about 40 rifles, shotguns and pistols that would be specifically banned by manufacturer and model, including the AK-47 and Uzi." (*Id.* at p. I21, cols. 3-4.) Senate Bill 292, which retained the generic definition approach, was approved by the Senate Judiciary Committee the same day. (Ingram & Gillam, *supra*, at p. I1, col. 4; see Sample & Richardson, *State Ban on Assault Weapons Gains*, Sacramento Bee (Mar. 1, 1989) p. A1.)

On March 9, 1999, Senate Bill 292 was approved by the Senate. Governor George Deukmejian expressed misgivings about the generic definition approach in the Senate bill, indicating that he favored the list approach taken by the Assembly. (Ingram, *State Senate Votes to Ban Assault Guns*, L.A. Times (Mar. 10, 1989) p. I1, col. 3; see Matthews, *Gun Ban Breezes in Senate/NRA Predicts Ban Will Die in Assembly*, Sacramento Bee (Mar. 10, 1989) p. A1.) On March 13, 1989, the Assembly passed Assembly Bill 357, with its list approach "on a 41-38 vote, the exact simple majority required in the 80-member chamber." (Ingram & Gillam, *Assembly Passes Assault Gun Ban*, L.A. Times (Mar. 14, 1989) p. I1, col. 5.) On April 4, 1989, Senate Bill 292 was amended by the Assembly Public Safety Committee to substitute the list approach for the generic definition approach, and as so amended, was approved by the committee. The same day the Senate Judiciary Committee approved Assembly Bill 357. (Ingram, *Tougher of 2 Bills to Outlaw Assault Rifles Is Weakened by Panel*, L.A. Times (Apr. 5, 1989) p. I3, col. 5; Sample, *Panel Narrows, OKs Assault-Weapons Ban*, Sacramento Bee (Apr. 5, 1989) p. A3.)

On May 15, 1989, a Senate Assembly conference committee "ratified a compromise with Gov. George Deukmejian," one element of which was a provision "aimed at ridding from the marketplace facsimile assault arms that are so close to being the real thing that they constitute an assault weapon. It would be up to the state attorney general to persuade a Superior Court judge that such was the case before the facsimile could be added to the list of banned guns." (Ingram, *Panel Votes Compromise on Assault Weapons Ban*, L.A. Times (May 16, 1989) p. I3, col. 5; see Sample, *Conferees Approve Gun-Ban Compromise*, Sacramento Bee (May 16, 1989) p. A3.) On May 18, 1989, both the Assembly and the Senate approved the bill and sent it to the Governor. In the Assembly, it had again obtained just 41 votes, the bare majority required for approval. (Ingram, *Assault Gun Ban Wins Final Vote,* L.A. Times (May 19, 1989) p. I1, col. 5.) On May 24, 1989, Governor Deukmejian signed the legislation. " 'It's well known that some drug dealers and violent gang members are using assault-type weapons,' the governor said before signing the measures. [¶] 'In the face of such firepower, our

state's courageous law enforcement officers need all the help that we can give them as they seek to preserve our public safety,' he said." (Sample, *Duke Signs into Law Ban on Most Assault Arms*, Sacramento Bee (May 25, 1989) p. A1.)

In seeking to address the grave threat to public safety posed by the possession and use of assault weapons by criminals, the Legislature was clearly walking a tightrope. Anti-gun-control groups like the National Rifle Association were adamantly opposed to an assault weapons ban, regardless of the approach taken—generic definition or list. (See, e.g., Matthews, *Biggest Gun-Ban Shootout Remains: Combining Two Bills*, Sacramento Bee (Mar. 27, 1989) p. A1.) On the other hand, a spokesman for the California Police Chiefs Association said neither bill went far enough. (*Ibid.*) Of the two approaches, many proponents of an assault weapons ban preferred a generic definition. Attorney General Van de Kamp, for example, warned that manufacturers could get around a list merely by renaming a firearm or making simple cosmetic changes in the weapon's design. (Ingram & Gillam, *Assault Gun Ban Gains in Legislature*, L.A. Times, *supra*, p. I21, cols. 4-5.) However, key figures like Governor Deukmejian and Assemblyman Quackenbush were concerned the proposed generic definition would sweep too broadly—that it would ban semiautomatic weapons used for legitimate sports and recreational purposes. The bottom line, apparently, was that an assault weapons ban would have died in the Assembly that session, had the proponents insisted on defining assault weapons generically.

The perfect can be the enemy of the good. The Legislature was convinced that "the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state." (§ 12275.5.) Given that conviction, the Legislature was not constitutionally compelled to throw up its hands just because a perfectly comprehensive regulatory scheme was not politically achievable. " ' "The problems of government are practical ones and may justify, if they do not require, rough accommodations— illogical, it may be, and unscientific." ' " (*Dallas v. Stanglin* (1989) 490 U.S. 19, 27 [109 S.Ct. 1591, 1596, 104 L.Ed.2d 18], quoting *Metropolis Theatre Co. v. City of Chicago* (1913) 228 U.S. 61, 69-70 [33 S.Ct. 441, 443, 57 L.Ed. 730].)

The rough accommodations the Legislature made here are explained in its findings and declarations. "The Legislature has restricted the assault weapons specified in Section 12276 based upon finding that each firearm has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings. It is the intent of the

Legislature in enacting this chapter to place restrictions on the use of assault weapons and to establish a registration and permit procedure for their lawful sale and possession. It is not, however, the intent of the Legislature by this chapter to place restrictions on the use of those weapons which are primarily designed and intended for hunting, target practice, or other legitimate sports or recreational activities." (§ 12275.5.)

The Legislature was, in short, confronted with two conflicting societal interests, both of which it recognized as legitimate—the interest of all citizens in being protected against the use of semiautomatic weapons by criminals, and the interest of some citizens in using semiautomatic weapons for hunting, target practice, or other legitimate sports or recreational activities. Seeking to accommodate these conflicting interests, the Legislature decided to list the models of semiautomatic weapons that were to be considered assault weapons. It chose the list approach, the Legislature declared, "because it was the most effective way to identify and restrict a specific class of semiautomatic weapons." (§ 12276, subd. (f).) The Legislature was not unmindful of the fact that the section 12276 list was not, and could not be, complete. In its uncodified findings and declarations, the Legislature explained that the add-on provision was intended to compensate for the inherent limitations of the list approach. "It is the intent, therefor[e], to ban the weapons enumerated in Section 12276 of the Penal Code and any other models which are only variations of these weapons, which are the same weapon but manufactured or sold by another company under a licensing agreement, or which are new models manufactured or sold by any company with just minor modifications or new model numbers in order to circumvent the prohibitions of Chapter 2.3 (commencing with Section 12275) of Title 2 of Part 4 of the Penal Code." (Stats. 1989, ch. 18, § 6, p. 59.)

The step-by-step approach adopted here—the list plus the add-on provision—does not violate principles of equal protection. As previously stated, both the United States Supreme Court and this court have recognized the propriety of a legislature's taking reform " 'one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.' " (*Warden v. State Bar, supra*, 21 Cal.4th at p. 645, quoting *Williamson v. Lee Optical Co., supra*, 348 U.S. 483, 489 [75 S.Ct. 461, 465].) "[A] legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked." (*McDonald v. Board of Election* (1969) 394 U.S. 802, 809 [89 S.Ct. 1404, 1409, 22 L.Ed.2d 739].)

In *Minnesota v. Clover Leaf Creamery Co., supra*, 449 U.S. 456, the State of Minnesota banned retail sale of milk in plastic nonreturnable, nonrefillable containers, but permitted such sale in other nonreturnable, nonrefillable

containers, such as paperboard milk cartons. Defending the statute against an equal protection challenge, the state acknowledged evidence that the plastic milk jug was the most popular, and the paperboard carton the most cumbersome and least well-regarded package in the industry, but argued that the ban on plastic nonreturnables would buy time during which environmentally preferable alternatives might be further developed and promoted. Rejecting this rationale, the Minnesota District Court found that the statute was actually intended to promote the economic interests of certain segments of the dairy and pulpwood industries at the expense of the economic interests of other segments of the dairy and plastics industries. The Minnesota Supreme Court affirmed, striking down the statute on equal protection grounds and expressing doubt that the state would have taken any further steps to promote environmentally sound milk packaging. The high court reversed. "We find the State's approach fully supportable under our precedents. This Court has made clear that a legislature need not 'strike at all evils at the same time or in the same way,' *Semler* v. *Oregon State Board of Dental Examiners*, 294 U.S. 608, 610 [55 S.Ct. 570, 571, 79 L.Ed. 1086] (1935), and that a legislature 'may implement [its] program step by step, . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.' *New Orleans* v. *Dukes* [(1976)] 427 U.S. [297,] 303 [96 S.Ct. 2513, 2517, 49 L.Ed.2d 511]. [Citations.] The Equal Protection Clause does not deny the State of Minnesota the authority to ban one type of milk container conceded to cause environmental problems, merely because another type, already established in the market, is permitted to continue in use." (449 U.S. at p. 466 [101 S.Ct. at p. 725].)

The principles of equal protection analysis reiterated in *Minnesota* v. *Clover Leaf Creamery Co., supra*, 449 U.S. 456, have been applied in a variety of contexts. For example, in *United States* v. *Kiffer* (2d Cir. 1973) 477 F.2d 349, the court of appeals rejected the argument that the Comprehensive Drug Abuse Prevention and Control Act of 1970 was irrationally underinclusive. Even if it were true, as appellants contended, that marijuana was less harmful than legally available substances such as tobacco and alcohol, "this does not render the statute here unconstitutional," the court of appeals held. (477 F.2d at p. 355.) "If Congress decides to regulate or prohibit some harmful substances, it is not thereby constitutionally compelled to regulate or prohibit all. It may conclude that half a loaf is better than none. [Citations.]" (*Ibid.*; accord, *National Organization for Reform of Marijuana Laws* v. *Gain* (1979) 100 Cal.App.3d 586, 593-594 [161 Cal.Rptr. 181].) In *Sherwin-Williams* v. *City & County of San Francisco* (N.D.Cal. 1994) 857 F.Supp. 1355, manufacturers and retailers of markers and spray paint challenged the constitutionality of the city's "lock up" antigraffiti ordinance,

which prohibited retailers from displaying markers and spray paint for sale unless they were maintained in places accessible only with employee assistance. The court rejected plaintiffs' contention that the ordinance was irrationally underinclusive because it did not restrict access to other products that might be used to create graffiti. "In drafting anti-graffiti legislation, there was nothing irrational about the Board of Supervisors' decision to focus its energies on the most commonly used graffiti implements, rather than striking out at once at all of the available substitutes." (*Id.* at p. 1372.)

Of the cases involving equal protection challenges to assault weapons bans, the Attorney General relies on *Benjamin, supra,* 662 A.2d 1226, while plaintiffs rely on *Springfield Armory, Inc. v. City of Columbus* (6th Cir. 1994) 29 F.3d 250 (*Springfield Armory*). In *Benjamin,* the plaintiffs challenged a list-type assault weapons ban on the ground, among others, that it was irrationally underinclusive because it failed to include weapons that were virtually identical to listed weapons. Not surprisingly, given the nationwide character of the debate over gun control, the Connecticut Legislature faced the same sorts of political constraints as did the California Legislature, and like the California Legislature finally settled for a compromise it knew to be imperfect. One Connecticut senator said, " 'If we restrict the list, we're damned because of the guns we left out. If we expand the list, we're damned for the guns we keep in.' " (*Benjamin, supra,* 662 A.2d at p. 1239, fn. 12.) Another admitted: " 'This is not the perfect bill. It's not the solution, but it's a step in the right direction.' " (*Ibid.*) Appreciating the dilemma faced by its legislature, the Supreme Court of Connecticut rejected the equal protection challenge. "The legislature . . . is not restricted in its options either to banning all weapons it considers harmful to the welfare of the citizenry or to banning none at all." (*Ibid.*, fn. omitted.)

In *Springfield Armory, supra,* 29 F.3d 250, the Sixth Circuit Court of Appeals struck down a list-type assault weapons ordinance as unconstitutionally vague, no equal protection claim having been raised. "[T]he ordinance is fundamentally irrational . . . . The Columbus ordinance outlaws assault weapons only by outlawing certain brand names without including within the prohibition similar assault weapons of the same type, function or capability. The ordinance does not achieve the stated goal of the local legislature—to get assault weapons off the street. The ordinance purports to ban 'assault weapons' but in fact bans only an arbitrary and ill-defined subset of these weapons without providing any explanation for its selections. Many assault weapons remain on the market . . . ." (*Id.* at p. 252.)

We are not persuaded by *Springfield Armory.* Doubtless, 10 years after the AWCA became law in California many semiautomatic weapons potentially

classifiable as assault weapons remain on the market here. That may or may not be regrettable, depending upon one's views on this highly charged public policy question, but it does not amount to a constitutionally fatal flaw in the AWCA. As the high court pointed out in the context of the packaging legislation it reviewed in *Minnesota v. Clover Leaf Creamery Co., supra,* 449 U.S. at page 466 [101 S.Ct. at page 725]: "Whether *in fact* the Act will promote more environmentally desirable milk packaging is not the question: the Equal Protection Clause is satisfied by our conclusion that the Minnesota Legislature *could rationally have decided* that its ban on plastic nonreturnable milk jugs might foster greater use of environmentally desirable alternatives." The Legislature here was under no illusion that the AWCA would rid the streets of assault weapons in one fell swoop. Instead, the Legislature intended that the approach it finally settled upon in the AWCA—designating certain assault weapons by type, series, and model, while providing a mechanism for adding others "which are only variations of these weapons, which are the same weapon but manufactured or sold by another company under a licensing agreement, or which are new models manufactured or sold by any company with just minor modifications or new model numbers in order to circumvent the [AWCA's] prohibitions" (Stats. 1989, ch. 18, § 6, p. 59)—would make California a safer place, even if only marginally and incrementally. We are not prepared to say that the Legislature's expectation was irrational or that, to pass constitutional muster, its ambitions had to be grander.[2]

B. *Separation of Powers*

▇ Plaintiffs contend, and the Court of Appeal agreed, that the add-on provision of section 12276.5 violates the separation of powers doctrine. After reviewing the fundamental policies that inform the separation of powers jurisprudence of this court and the United States Supreme Court, we reject this challenge.

"An unconstitutional delegation of authority occurs only when a legislative body (1) leaves the resolution of fundamental policy issues to others or

---

[2]Because we have concluded that plaintiffs' equal protection challenge must be rejected even if, as plaintiffs contend, section 12276 covers only the specific makes and models listed in that provision, we need not reach the Attorney General's argument that the challenge is based on a misreading of the AWCA. "[Plaintiffs'] basic premise that various weapons allegedly identical in design produced by different manufacturers were not included by [the] Legislature is defeated by the plain language of the statute," the Attorney General contends, because subdivision (f) of section 12276 states that the list includes "any other models which are only variations of those weapons with minor differences regardless of manufacturer." (See also § 12276, subds. (a)(1) [defining "assault weapon" to mean "[a]ll AK series including, but not limited to, the models identified as follows"], (e) ["[t]he term 'series' includes all other models that are only variations, with minor differences, of those models listed in subdivision (a), regardless of the manufacturer"].)

(2) fails to provide adequate direction for the implementation of that policy. (*Kugler* v. *Yocum* (1968) 69 Cal.2d 371, 376-377 [71 Cal.Rptr. 687, 445 P.2d 303].)" (*Carson Mobilehome Park Owners' Assn.* v. *City of Carson* (1983) 35 Cal.3d 184, 190 [197 Cal.Rptr. 284, 672 P.2d 1297].)

The delegation here, the Court of Appeal concluded, suffers from a defect of the second sort—the failure to provide adequate direction for the implementation of legislative policy. "[B]y what reasoning," the Court of Appeal asked, "does a judge determine whether a gun is merely 'redesigned' from another or has modifications or enhancements which are but 'slight?' What is 'slight' enough or 'redesigned' enough?"

Actually, the role that the courts play in implementing the add-on procedure is a very narrow, essentially adjudicatory one. The Attorney General initiates the add-on procedure by filing a petition in certain superior courts seeking a declaration of "temporary suspension of the manufacture, sale, distribution, transportation, or importation into the state, or the giving or lending of a firearm alleged to be an assault weapon within the meaning of Section 12276." The grounds for such a declaration are that the firearm is either of the following: "(1) Another model by the same manufacturer or a copy by another manufacturer of an assault weapon listed in subdivision (a), (b), or (c) of Section 12276 which is identical to one of the assault weapons listed in those subdivisions except for slight modifications or enhancements including, but not limited to: a folding or retractable stock; adjustable sight; case deflector for left-handed shooters; shorter barrel; wooden, plastic or metal stock; larger magazine size; different caliber provided that the caliber exceeds .22 rimfire; or bayonet mount. The court shall strictly construe this paragraph so that a firearm which is merely similar in appearance but not a prototype or copy cannot be found to be within the meaning of this paragraph. [¶] (2) A firearm first manufactured or sold to the general public in California after June 1, 1989, which has been redesigned, renamed, or renumbered from one of the firearms listed in subdivision (a), (b), or (c) of Section 12276, or which is manufactured or sold by another company under a licensing agreement to manufacture or sell one of the firearms listed in subdivision (a), (b), or (c) of Section 12276, regardless of the company of production or distribution, or the country of origin." (§ 12276.5, subd. (a).)

At the hearing on a permanent declaration, the burden of proof is on the Attorney General to show by a preponderance of the evidence that the firearm is an assault weapon. If the court finds that the firearm comes within the criteria set forth in subdivision (a) of section 12276.5, the court "shall issue a declaration that it is an assault weapon under Section 12276. Any party to the matter may appeal the court's decision." (§ 12276.5, subd. (f).)

It is instructive to contrast the essentially adjudicatory determination that section 12276.5 calls upon the superior court to make with the much more policy-laden, quasi-legislative determinations that were nevertheless upheld in the face of separation of powers challenges by the United States Supreme Court in *Mistretta v. United States* (1989) 488 U.S. 361 [109 S.Ct. 647, 102 L.Ed.2d 714] (*Mistretta*), and by this court in *People v. Wright* (1982) 30 Cal.3d 705 [180 Cal.Rptr. 196, 639 P.2d 267] (upholding the delegation of authority to the Judicial Council to promulgate sentencing guidelines).

In *Mistretta*, the high court reviewed the constitutionality of the Sentencing Reform Act, under which Congress delegated authority to the Sentencing Commission to promulgate sentencing guidelines for federal criminal offenses, placed the commission within the judicial branch, and required federal judges to serve on it along with nonjudges. In upholding the Sentencing Commission against a separation of powers challenge, the court acknowledged that the Sentencing Commission was "unquestionably . . . a peculiar institution within the framework of our Government," but went on to say that "[o]ur constitutional principles of separated powers are not violated, however, by mere anomaly or innovation." (*Mistretta, supra,* 488 U.S. at pp. 384-385 [109 S.Ct. at p. 661].)

It is concern about " 'encroachment and aggrandizement,' " the court reiterated in *Mistretta*, that has animated its separation of powers jurisprudence. (*Mistretta, supra,* 488 U.S. at p. 382 [109 S.Ct. at p. 660].) "Accordingly, we have not hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch. . . . By the same token, we have upheld statutory provisions that to some degree commingle the functions of the Branches, but that pose no danger of either aggrandizement or encroachment." (*Id.* at p. 382 [109 S.Ct. at p. 660].) Applying these principles, the court upheld the Sentencing Reform Act after measuring it against the following standard: "Congress may delegate to the Judicial Branch nonadjudicatory functions that do not trench upon the prerogatives of another Branch and that are appropriate to the central mission of the Judiciary." (*Id.* at p. 388 [109 S.Ct. at p. 663].)

The delegation here satisfies this standard. None of the three branches is aggrandized by the delegation or encroached upon by it. And the authority delegated to the superior court—to serve as a check on the power delegated to the executive branch by reviewing the question whether a firearm the Attorney General wishes to add to the list of assault weapons satisfies the criteria set forth in section 12276.5—is appropriate to the central mission of

the judiciary. Admittedly, having the court conduct the review as the final act in the exercise of a legislatively delegated power is, in the language of *Mistretta*, "peculiar," but as that case reminded us, "[o]ur constitutional principles of separated powers are not violated . . . by mere anomaly or innovation." (*Mistretta, supra*, 488 U.S. at pp. 384-385 [109 S.Ct. at p. 661].)

What Mistretta's argument really came down to, the Supreme Court said, was not that the substantive responsibilities of the Sentencing Commission aggrandized the judicial branch, "but that that Branch is inevitably weakened by its participation in policymaking." (*Mistretta, supra*, 488 U.S. at p. 395 [109 S.Ct. at p. 667].) This concern, the high court held, was not well founded with regard to the Sentencing Commission. "We do not believe . . . that the placement within the Judicial Branch of an independent agency charged with the promulgation of sentencing guidelines can possibly be construed as preventing the Judicial Branch 'from accomplishing its constitutionally assigned functions.' *Nixon* v. *Administrator of General Services* [(1977)] 433 U.S. [425,] 443 [97 S.Ct. 2777, 2790, 53 L.Ed.2d 867]. Despite the substantive nature of its work, the Commission is not incongruous or inappropriate to the Branch. As already noted, sentencing is a field in which the Judicial Branch long has exercised substantive or political judgment. What we said in *Morrison* when upholding the power of the Special Division to appoint independent counsel applies with even greater force here: 'This is not a case in which judges are given power . . . in an area in which they have no special knowledge or expertise.' [*Morrison v. Olson* (1988)] 487 U.S. [654,] 676, n. 13 [108 S.Ct. 2597, 2611, 101 L.Ed.2d 569]. On the contrary, Congress placed the Commission in the Judicial Branch precisely because of the Judiciary's special knowledge and expertise." (*Id.* at pp. 395-396 [109 S.Ct. at p. 667].)

The same may be said here; that is, this is not a case in which judges are given power in an area in which they have no special knowledge or expertise, but rather a case in which the Legislature turned to the courts precisely because of their special knowledge and expertise in reviewing questions of the sort at issue in a section 12276.5, subdivision (f), hearing— whether a firearm alleged by the Attorney General to be an assault weapon comes within the criteria set forth in section 12276.5, subdivision (a). Moreover, the amici curiae supporting the Attorney General contend that the fact the Legislature divided the authority it delegated between the executive and judicial branches, instead of confiding the whole of it to the Attorney General, should not be considered a fatal flaw in the AWCA, but rather a virtue. The amici curiae have a point. For the Legislature to set up the courts as a check upon the exercise of power it is delegating to the Attorney

General is, in itself, perfectly in keeping with the separation of powers doctrine, the primary purpose of which is to prevent the combination in the hands of a single person or group of the basic or fundamental powers of government. (See *In re Attorney Discipline System* (1998) 19 Cal.4th 582, 596 [79 Cal.Rptr.2d 836, 967 P.2d 49]; *Davis v. Municipal Court* (1988) 46 Cal.3d 64, 76 [249 Cal.Rptr. 300, 757 P.2d 11]; *Parker v. Riley* (1941) 18 Cal.2d 83, 89 [113 P.2d 873, 134 A.L.R. 1405].)

However, it may be objected, the separation of powers doctrine not only guards against the concentration of power in a single branch of government; it also protects one branch against the overreaching of the others. (See *In re Attorney Discipline System, supra*, 19 Cal.4th at p. 596; *Hustedt v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 338 [178 Cal.Rptr. 801, 636 P.2d 1139]; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 141 [93 Cal.Rptr. 234, 481 P.2d 242].) The Court of Appeal found overreaching in this delegation. "The Legislature cannot bestow legislative power on judges. For example, in *Epperson* v. *Jordan* (1938) 12 Cal.2d 61 [82 P.2d 445] (*Epperson*), the California Supreme Court invalidated statutes which tried to draft members of this court to write titles for initiative measures because 'they purport to confer nonjudicial duties on the appellate justices . . . .' "

Was the Legislature here guilty of the overreaching we condemned in *Epperson*? The rationale of our decision, we said in *Epperson, supra*, 12 Cal.2d at page 64, "need not be discussed at length. The principles involved have recently and exhaustively been considered by this court in *Abbott* v. *McNutt* [(1933)] 218 Cal. 225 [22 P.2d 510, 89 A.L.R. 1109].)" In *Abbott v. McNutt, supra*, 218 Cal. 225, this court reviewed the constitutionality of a county charter provision that judges of that county, or their nominees, were to serve as members of a " 'qualification board' " to recruit and submit to the board of supervisors candidates for the position of county executive. Although we mentioned the nondelegation doctrine, our decision did not turn on it. (*Id.* at p. 228.) Instead, we held that service on the qualifications board would have violated the prohibition of article VI, former section 18 (see now § 17) of the California Constitution against judges' holding "any other office or public employment" during their judicial term. The "purpose and policy" underlying this constitutional prohibition, we observed, was cogently stated by Justice Cardozo in *In re Richardson* (1928) 247 N.Y. 401 [160 N.E. 655 [247 N.Y. 401, 160 N.E. 655]]. " 'The policy is to conserve the time of the judges for the performance of their work, and to save them from the entanglements, at times the partisan suspicions, so often the result of other and conflicting duties.' In other words, it is intended to exclude judicial officers from such extrajudicial activities as may tend to militate against the free, disinterested and impartial exercise of their judicial functions." (*Abbott*

*v. McNutt, supra,* 218 Cal. at p. 229, quoting *In re Richardson, supra,* 160 N.E. at p. 661.) Service on the qualification board, we noted, might involve the county's judges "in those 'entanglements' and subject them to those 'partisan suspicions' of which the constitutional inhibition, in its wisdom, seeks to free them." For example, they might one day have been required to try charges of misfeasance against a county executive they had recommended as qualified. (*Abbott v. McNutt, supra,* 218 Cal. at p. 230.)

Was the policy that informed our decisions in *Epperson* and *Abbott*—the policy, in the words of Justice Cardozo, "to conserve the time of the judges for the performance of their work as judges, and to save them from the entanglements, at times the partisan suspicions, so often the result of other and conflicting duties"—violated by the delegation here? (*In re Richardson, supra,* 160 N.E. at p. 661.) Insofar as the first prong of Justice Cardozo's stricture is concerned—conserving the time of judges for the performance of their work—any violation was de minimis, certainly as measured against the facts of *In re Richardson.* In that case, the Governor of New York, pursuant to statutory authorization, directed a New York judge to take evidence and report to him as to whether the president of the Borough of Queens should be removed. In holding that the judge was disqualified, while retaining judicial office, from acting as the governor's delegate in such a matter, Justice Cardozo observed that the inquiry had "already separated the respondent for more than two months from the discharge of his judicial duties, and . . . is likely to continue [to do so] for many weeks to come. . . . Interference so prolonged with assignments to judicial duty is the very evil that was meant to be hit by the prohibitions of the [New York] Constitution directed against dual office." (*Ibid.*)

The duties imposed upon the judicial officers in *Epperson* and *Abbott* were not nearly as time-consuming as those in *In re Richardson,* but they still posed an unacceptably high risk of " 'entanglements' " and " 'partisan suspicions.' " (*Abbott v. McNutt, supra,* 218 Cal. at p. 230.) Does the delegation here carry a significant risk of that sort? It might well, if the judge were called upon to *initiate* the process of adding firearms to the list of assault weapons, but that role is played by the Attorney General under section 12276.5, and the court plays its familiar role of reviewing a legal question—whether the criteria set forth in the statute were satisfied.

A related concern is whether the role the Legislature assigned to the courts in section 12276.5 will undermine the public's confidence in the *impartiality* of the judiciary. A concern in this regard led the United States Court of Appeals for the Eleventh Circuit to hold that the appointment of two article III judges to the Organized Crime Commission, which was to advise the

President and the United States Attorney General of actions that could be taken to improve law enforcement efforts directed against organized crime, violated the separation of powers doctrine. "Impartiality is one of the central, constitutionally-ordained, requirements of the federal judicial office, . . . and this impartiality is threatened by many of the activities of the Commission. A judge who is charged with assisting and improving enforcement efforts against organized crime must adopt a pro-government perspective which is ill-suited to his obligation to be neutral in the courtroom. The kind of information he might uncover through the investigatory activities of the Commission would further endanger his impartiality. If the data and testimony surveyed by the Commission were to demonstrate, for example, that the magnitude of the threat posed by organized crime was greater than had previously been suspected, that a substantial amount of organized crime activity was never prosecuted, or that law enforcement officials in many parts of the country employed methods which were poorly chosen, subject to abuse or inadequate to combat the problem, such discoveries could affect the way the judge approached those organized crime suspects and law enforcement officials . . . who appeared before him. Moreover, even if a judge could satisfy himself that he could separate his participation on the Commission from his judicial functions, it is not clear that litigants could sustain equal faith in his impartiality." (*Application of President's Com'n on Crime* (11th Cir. 1985) 763 F.2d 1191, 1197.)

The duty imposed upon the courts here, reviewing the question whether a firearm the Attorney General wishes to add to the list of assault weapons satisfies the criteria set forth in section 12276.5, clearly does not raise the same sorts of concerns with regard to impartiality that service on the Organized Crime Commission did. Moreover, the United States Court of Appeals for the Third Circuit did not share the concern of the Eleventh Circuit that such service would undermine the impartiality of the judiciary in fact or appearance. (See *Matter of President's Com'n on Organized Crime* (3d Cir. 1986) 783 F.2d 370 (*Scarfo*).) A separation of powers challenge involving the conferral of power upon the judicial branch, the Third Circuit said, should be reviewed in terms of the functional analysis set out in *Nixon v. Administrator of General Services, supra*, 433 U.S. 425, 443 [97 S.Ct. 2777, 2790]; that is, the focus should be upon the extent to which the challenged action prevents the judiciary from accomplishing its constitutionally assigned functions. (*Scarfo, supra*, 783 F.2d at p. 375.) The service of two judges on the Organized Crime Commission "does not disable any other Article III judge or any court from performing properly assigned duties. In the event of recusals there will be a substitution of Article III judges and the work of the courts will not be impaired. [¶] . . . What is present here is a limited dislocation and not one which would require reassignment of a large

number of cases." (*Id.* at p. 381.) The same holds true here. Under section 12276.5, subdivision (a), the Attorney General may file a temporary suspension petition only in superior courts of counties with a population of more than 1,000,000, and the likelihood that a judge would be called upon to try a prosecution under the AWCA involving a firearm of a sort that she or he had earlier declared an assault weapon under section 12276.5 is remote, so any recusals occasioned by section 12276.5 should not be disruptive.

Finally, some commentators perceive in legislative bodies a tendency to *duck* controversial issues, and upholding a delegation of this sort will only encourage that tendency, they would argue. His dissents in *Morrison v. Olson, supra,* 487 U.S. 654, 697 [108 S.Ct. 2597, 2622] and *Mistretta, supra,* 488 U.S. 361, 413 [109 S.Ct. 647, 676], suggest Justice Scalia might be in this camp. In criticizing the legislative veto, then Professor Scalia deplored the inclination he found in Congress to delegate political judgments it considered "too hot to handle." Title IX of the Education Amendments of 1972 was a good example of this tendency, he suggested. "It was apparent when that law was passed that its concrete application would arouse heated controversy over precisely such issues as all-male sports, unisex dorms, and even unisex toilets. Was it not more appealing for Congress to take the high road, winning approval from all sides by being against 'sex discrimination'—and leaving to the agencies the inevitable alienation of one or another constituency which accompanies the act of giving that term content?" (Scalia, *The Legislative Veto: A False Remedy for System Overload* (Nov.-Dec. 1979) Regulation, pp. 19, 24.) We must not assume, however, that such unworthy motives prompt a delegation. As Judge Carl McGowan of the District of Columbia Circuit noted, while Congress may "fix[] upon broad delegation for reasons of internal political maneuver or as an escape from having to stand up and be counted," most delegations are legitimate responses to the fact that Congress, "in an increasingly complex and changing world, is called upon to deal with subject matter that is novel and imprecise, and for which it is frequently ill-equipped to do more than to paint with a broad brush, leaving the details to be filled in by less unwieldy and more expert administrative authority." (McGowan, *Congress, Court and Control of Delegated Power* (1977) 77 Colum. L.Rev. 1119, 1128-1129.) The delegation in the present case is manifestly of the latter sort. For good or ill, the Legislature stood up and was counted on this issue, one of the most contentious in modern society. The task it delegated—amending the list of assault weapons to capture the protean modifications of the weapons—was one it could not reasonably be expected to perform itself.

### C. *Due Process*

■ A law failing to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited violates due process under both the

federal and California Constitutions. (*Grayned v. City of Rockford* (1972) 408 U.S. 104, 108 [92 S.Ct. 2294, 2298, 33 L.Ed.2d 222]; *People v. Heitzman* (1994) 9 Cal.4th 189, 199 [37 Cal.Rptr.2d 236, 886 P.2d 1229].) Section 12276.5 violates this standard, the Court of Appeal held, "because it defines the weapons which can be added on as those with 'slight' modifications and those which have been 'redesigned, renamed, or renumbered' from guns on the list. (§ 12276.5, subd. (a)(1), (2).) Reasonable persons can understand renaming and renumbering. But what is a 'slight' modification or a 'redesign?' "

The questions raised by the Court of Appeal are not questions ordinary citizens must answer at their peril. Rather, they are questions the Attorney General must address in deciding whether to petition the superior court for a declaration of temporary suspension (§ 12276.5, subd. (a)), and that the superior court must resolve in determining whether to issue a permanent declaration that a firearm is an assault weapon (§ 12276.5, subd. (f)). If the superior court issues a permanent declaration that a specified firearm is an assault weapon, then the Attorney General must, within 90 days, promulgate an amended list of the firearms designated as assault weapons in section 12276, or added to the list pursuant to section 12276.5, and the amended list must be filed by the Attorney General with the Secretary of State for publication in the California Code of Regulations. (§ 12276.5, subd. (h).) Therefore, concerned citizens need not struggle with the question whether, for example, a particular firearm is identical to one of the listed assault weapons except for slight modifications. The citizens may simply consult the amended list. (The availability of the amended list distinguishes the cases upon which the Court of Appeal relied in holding the AWCA unconstitutionally vague—*Springfield Armory, supra*, 29 F.3d 250, and *Robertson v. City and County of Denver* (Colo. 1994) 874 P.2d 325 [29 A.L.R.5th 837].) Because the standard set forth in section 12276.5, subdivision (a), is to be applied by the Attorney General and the superior court, we need not and do not reach the question whether it would be unconstitutionally vague if ordinary citizens were required to apply it.

■ The Court of Appeal held the AWCA violates due process in a second respect: "[T]he Act deprives citizens of notice of the law because there is a temporal gap between the declaration of suspension and publication of notice thereof. During that period of time the Act treats the gun as an 'assault weapon,' meaning a person could be a felon for lending it to a fellow hunter. . . . But at that moment in time, the new 'list' has yet to be published to the world. There is literally no 'notice' of the law."

As to this challenge, the Attorney General defends the AWCA on a number of grounds, not all of them consistent with one another. First, the

Attorney General argues that the giving or lending of a firearm during the "temporal gap" would never be the subject of a temporary suspension order. As the Attorney General notes, section 12276.5, subdivision (a) contains disjunctive clauses: "Upon request by the Attorney General . . . , the superior court shall issue a declaration of temporary suspension of the manufacture, sale, distribution, transportation or importation into the state, *or* the giving or lending of a firearm alleged to be an assault weapon within the meaning of Section 12276 because the firearm" satisfies the criteria set out in paragraphs (1) and (2) of subdivision (a). (Italics added.) Seizing upon the disjunction, the Attorney General argues: "Only the Attorney General determines whether one or both of these groups will be subject to the temporary suspension. The reason for a temporary suspension is to prevent distribution of weapons declared to be assault weapons during the pendency of the [permanent suspension] hearing. . . . It seems illogical to assume that the Attorney General will choose to apply a temporary suspension to individuals who already possess the weapon." Illogical, perhaps, but not inconceivable. The Legislature apparently felt it important, and not illogical, to give the Attorney General the authority to temporarily suspend the giving or lending of a firearm alleged to be an assault weapon, so we cannot with confidence assume the Attorney General would never use that authority.

The Attorney General next argues that even if the giving or lending of a firearm alleged to be an assault weapon were temporarily suspended, the hunter in the Court of Appeal's hypothetical would receive constructive notice of the temporary suspension order pursuant to section 12276.5, subdivision (c).

Subdivision (c) of section 12276.5 provides: "Upon declaration of temporary suspension, the Attorney General shall immediately notify all police, sheriffs, district attorneys, *and those requesting notice pursuant to subdivision (d),* shall notify industry and association publications for those who manufacture, sell, or use firearms, *and shall publish notice in not less than 10 newspapers of general circulation in geographically diverse sections of the state* of the fact that the declaration has been issued." (Italics added.) Subdivision (d) of section 12276.5 provides in pertinent part: "The Attorney General shall maintain a list of any persons who request to receive notice of any declaration of temporary suspension and shall furnish notice under subdivision (c) to all these persons immediately upon a superior court declaration." Subdivision (b) of section 12276.5 provides that upon the issuance of a declaration of temporary suspension "and after the Attorney General has completed the notice requirements of subdivisions (c) and (d)," the penalty provisions of subdivision (a) of section 12280 shall apply with

respect to the weapons subject to the temporary suspension declaration. And finally, subdivision (a)(1) of section 12280 makes it a felony for a person to manufacture, distribute, transport, import, sell, possess, or lend an assault weapon in this state, except as provided in the AWCA.

Plaintiffs object that an ordinary gun owner is not likely to request notice of temporary suspensions pursuant to subdivision (d) of section 12276.5, and that constructive notice in newspapers is not constitutionally adequate. Amici curiae in support of the Attorney General respond, "gun owners can hardly be heard to complain about the unfairness of a statute which gives them the extraordinary right to receive from the Attorney General, upon request, specific notice of a temporary suspension." After all, amici curiae note, "California law attributes to all citizens constructive knowledge of the content of state statutes. . . ." In *Hale v. Morgan* (1978) 22 Cal.3d 388, 396 [149 Cal.Rptr. 375, 584 P.2d 512], the case upon which amici curiae rely, we acknowledged that the policy of charging citizens with knowledge of the law is based on a fiction because no one, of course, can know all the law. What amici curiae are impliedly asking us to do is stretch the fiction to cover cases where the law is to be found, not in the statute books, nor even at this point in the process in the California Code of Regulations, but rather in "10 newspapers of general circulation in geographically diverse sections of the state." (§ 12276.5, subd. (c).)

Tellingly, not even the Attorney General appears to be prepared to go that far, for he all but concedes that a person who did not have actual notice of a temporary suspension could not constitutionally be convicted of violating section 12280. "It is highly speculative and unlikely that anyone would be prosecuted under the law if they did not have prior notice of the temporary declaration. Furthermore, to the extent that a person could establish a lack of actual or constructive notice of a temporary declaration order and that there was not sufficient information to alert that person of the likelihood that their firearm was subject to regulation, that person would be able to raise an affirmative defense to a possible prosecution for a violation of the temporary declaration. The provisions of section 12276.5[, subdivision] (b), which require [completion] of the notice requirements before criminal sanctions apply, indicate that the reasonable interpretation of those provisions re-quire[s] a knowing violation of the temporary declaration, as a[n] element of that crime." We cannot agree with the Attorney General. The AWCA seems clearly to contemplate a section 12280 prosecution where the only notice of a temporary declaration would be predicated upon publication of the notice "in not less than 10 newspapers of general circulation in geographically diverse sections of the state." (§ 12276.5, subd. (c).) Such a prosecution would raise grave due process concerns. However, plaintiffs have failed to

shoulder their burden of showing the temporary declaration provision of the AWCA to be facially unconstitutional.

The standard governing a facial challenge to the constitutional validity of a statute has been the subject of controversy within this court. (See *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 342-343 [66 Cal.Rptr.2d 210, 940 P.2d 797] (plur. opn. of George, C. J.) (*American Academy*); *id.* at p. 412 (dis. opn. of Baxter, J.); *id.* at p. 421 (dis. opn. of Brown, J.); see also *California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 347 [84 Cal.Rptr.2d 425, 975 P.2d 622] (*California Teachers*).) We need not revisit that controversy here because plaintiffs have not even made the showing required under the formulations of the standard most favorable to their position; that is, they have failed to demonstrate that the temporary suspension provision of the AWCA would present due process notice issues in the "vast majority of its applications" (*American Academy, supra*, 16 Cal.4th at p. 343), or that it would present such problems " 'in the generality of cases' " (*California Teachers, supra*, 20 Cal.4th at p. 347). Accordingly, their facial challenge to the constitutionality of the statute must be rejected.

For the same reason, we reject plaintiffs' facial challenge to the statute based on a due process argument focusing on opportunity to be heard. When a hearing is set on permanent declaration that a weapon is an assault weapon, only manufacturers or California distributors of the weapon have a right to intervene. Others, including gun owners, "may, in the court's discretion, thereafter join the action as amicus curiae." (§ 12276.5, subd. (e).) Plaintiffs complain that gun owners might become criminally liable for failure to register without ever having had an opportunity to contest the addition of their guns to the list of assault weapons. This claim suffers from the same defect as plaintiffs' notice claim. While due process requirements might arguably prevent prosecution in a particular case—where a gun owner sought but was denied amicus curiae status at the section 12276.5, subdivision (e) hearing, or where the Attorney General's petition went unopposed because no one with an incentive to oppose it received actual notice of the hearing—plaintiffs' facial attack is inadequate because they have not demonstrated a deprivation of due process in the "vast majority" (*American Academy, supra*, 16 Cal.4th at p. 343) or " 'generality' " (*California Teachers, supra*, 20 Cal.4th at p. 347) of cases.

## II. Disposition

We reverse the judgment of the Court of Appeal.

George, C. J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**MOSK, J.**—I concur in the result and much of the reasoning of the majority opinion. I write separately to articulate a somewhat different view of the separation of powers issue.

As the majority correctly recognize, the role that courts play in the add-on procedures of Penal Code section 12276.5 is "essentially adjudicatory." (Maj. opn., *ante*, at p. 492.) Yet the majority's extensive discussion of cases involving the judiciary's performance of *extrajudicial* functions obscures this point. To my mind, the role the court is being asked to play in section 12276.5 is the traditional one of judicially reviewing whether administrative regulations comply with a statute, and there is therefore no real separation of powers issue.

Typically, quasi-legislative administrative regulations are reviewed via a writ of mandate under Code of Civil Procedure section 1085. (See *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 567 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) In this case, the Attorney General is for all intents and purposes promulgating a regulation pursuant to the very specific guidelines of Penal Code section 12276.5. The Legislature could have simply prescribed procedures by which the Attorney General would issue the regulations, and allow the challenge of the regulations through the normal writ of mandate procedures. It chose instead to use an alternate procedure for judicial review, one that occurs before the regulation can take effect. This procedure also places the burden on the government to prove the validity of the regulation rather than, in the usual writ of mandate proceedings, placing the burden on the one challenging the regulation to prove an abuse of discretion. (*Western States Petroleum, supra*, 9 Cal.4th at p. 568.) Although this form of judicial review is unconventional, it is not unconstitutional. Indeed, the judicial review prescribed by section 12276.5 is more protective of the individual's right to be free of overreaching government regulations than is conventional judicial review. Therefore, cases cited by plaintiffs regarding the delegation to the judiciary of extrajudicial functions (see, e.g., *Mistretta v. United States* (1989) 488 U.S. 361 [109 S.Ct. 647, 102 L.Ed.2d 714]) are simply inapposite.

For this reason, I agree that Penal Code section 12276.5 does not violate the constitutional separation of powers.

Werdegar, J., concurred.

**BROWN, J.—**

I

I concur in the judgment and opinion of the court. I am writing separately because, although the rejection of the equal protection claim is compelled by

the majority opinion in *Warden v. State Bar* (1999) 21 Cal.4th 628 [88 Cal.Rptr.2d 283, 982 P.2d 154] (*Warden*), I would independently reach the same conclusion under the unique circumstances of this case.

In *Warden*, a majority of this court abandoned our long-standing commitment to " ' "serious and genuine judicial inquiry" ' " into equal protection claims in favor of the highly deferential rational basis formulation articulated by the United States Supreme Court. (*Warden, supra*, 21 Cal.4th 628, 661 (dis. opn. of Brown, J.), quoting *Newland v. Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254], quoting *Dorrough v. Estelle* (5th Cir. 1974) 497 F.2d 1007, 1011.) Under the standard adopted by the *Warden* majority, " '[I]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge *if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.* [Citations.] Where there are "plausible reasons" for [the classification] "our inquiry is at an end." ' (*FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 313 [113 S.Ct. 2096, 2101, 124 L.Ed.2d 211], italics added, quoting *U.S. Railroad Retirement Bd.* v. *Fritz* (1980) 449 U.S. 166, 179 [101 S.Ct. 453, 461-462, 66 L.Ed.2d 368]; see, e.g., *Central State Univ. v. American Assn. of Univ. Professors, Central State Univ. Chapter* (1999) 526 U.S. 124, 126-128 [119 S.Ct. 1162, 1163, 143 L.Ed.2d 227]; *Werner* v. *Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, 130-132 [216 P.2d 825, 13 A.L.R.2d 252].)" (*Warden*, at p. 644.)

The dichotomy between the United States Supreme Court's laissez-faire treatment of social and economic rights and its hypervigilance with respect to an expanding array of judicially proclaimed fundamental rights is highly suspect, incoherent, and constitutionally invalid. "[T]he outcome in every case turns on how the court chooses to characterize the classification. Suspect classifications, such as those based on race or that impact rights the court deems 'fundamental,' warrant strict (read 'fatal') scrutiny; other classifications warrant rational basis (read 'anything goes') review. (*FCC* v. *Beach Communications, Inc., supra*, 508 U.S. 307, 313-316 [113 S.Ct. 2096, 2100-2103].) As Justice Mosk so aptly put it, '[t]he vice of the binary theory . . . is that it applies either a standard that is virtually always met (the rational relationship test) or one that is almost never satisfied (the strict scrutiny test). [Citation.] Once the test is selected, the result of its application is foreordained . . . .' (*Hays* v. *Wood* (1979) 25 Cal.3d 772, 796 [160 Cal.Rptr. 102, 603 P.2d 19] (conc. opn. of Mosk, J.).)" (*Warden, supra*, 21 Cal.4th at pp. 661-662 (dis. opn. of Brown, J.).) Just so, the result here was foreordained once we assumed "the AWCA does not burden a fundamental right under either the federal or state Constitutions, [and therefore] the

rational basis test applies. (See *Peoples Rights Organization, Inc. v. City of Columbus* (6th Cir. 1998) 152 F.3d 522, 531-533; *Coalition of New Jersey Sportsmen, Inc. v. Whitman* (D.N.J. 1999) 44 F.Supp.2d 666, 685; *California Rifle [& Pistol Assn., Inc. v. City of West Hollywood* (1998)] 66 Cal.App.4th 1302, 1329 [78 Cal.Rptr.2d 591]; *Suter v. City of Lafayette* (1997) 57 Cal.App.4th 1109, 1133 [67 Cal.Rptr.2d 420]; *In re Evans* (1996) 49 Cal.App.4th 1263, 1270 [57 Cal.Rptr.2d 314].)" (Maj. opn., *ante*, at p. 481.)

This case, however, illustrates the illusory nature of the distinction between "fundamental rights" and "areas of social and economic policy." Curiously, in the current dialectic, the right to keep and bear arms—a right expressly guaranteed by the Bill of Rights—is deemed less fundamental than implicit protections the court purports to find in the penumbras of other express provisions. (See, e.g., *Cruzan v. Director, Missouri Dept. of Health* (1990) 497 U.S. 261, 278-279 [110 S.Ct. 2841, 2851-2852, 111 L.Ed.2d 224]; *Zablocki v. Redhail* (1978) 434 U.S. 374, 384-387 [98 S.Ct. 673, 679-681, 54 L.Ed.2d 618]; *Moore v. East Cleveland* (1977) 431 U.S. 494, 499-500 [97 S.Ct. 1932, 1935-1936, 52 L.Ed.2d 531].) But surely, the right to preserve one's life is at least as fundamental as the right to preserve one's privacy.

The founding generation certainly viewed bearing arms as an individual right based upon both English common law and natural law, a right logically linked to the natural right of self-defense. Blackstone described self-defense as the "primary law of nature," which could not be taken away by the law of society. (2 Jones's Blackstone (1976) p. 4.) "[T]he peaceable part of mankind will be continually overrun by the vile and [the] abandoned, while they neglect the means of self defence. . . . The supposed quietude of the good man allures the ruffian; . . . (but) arms like laws discourage and keep the invader and the plunderer in awe, and preserve order in the world. . . . Horrid mischief would ensue were [the good] deprived of the use of [weapons] . . . the weak will become a prey to the strong." (1 Paine, The Writings of Thomas Paine (Conway edit. 1894) p. 56.) Extant political writings of the period repeatedly expressed a dual concern: facilitating the natural right of self-defense and assuring an armed citizenry capable of repelling foreign invaders and quelling tyrannical leaders.

After the Civil War a series of enactments, culminating with the Fourteenth Amendment, acknowledged the correlation between self-defense, citizenship, and freedom. Section 14 of the Freedmen's Bureau Act, which the 39th Congress passed over the President's veto, provided: "That in every State or district where the ordinary course of judicial proceedings has been interrupted by the rebellion, . . . the right to . . . have full and equal

benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, *including the constitutional right to bear arms, shall be* secured to and enjoyed by all the citizens of such State or district without respect to race or color, or previous condition of slavery. . . ." (Freedmen's Bureau Act, § 14 (July 16, 1866) 14 Stat. 176, italics added; see Halbrook, *Second Class Citizenship and the Second Amendment in the District of Columbia* (1995) 5 Geo. Mason U. Civ. Rts. L.J. 105, 141-150 (*Second Class Citizenship*).)

Halbrook concludes the Freedmen's Bureau Act, the Civil Rights Act of 1866, and the Fourteenth Amendment leave no doubt that " 'the constitutional right to bear arms' is included among the 'laws and proceedings concerning personal liberty, personal security,' and property, and that 'the free enjoyment of such immunities and rights' is to be protected" (*Second Class Citizenship, supra,* 5 Geo. Mason U. Civ. Rts. L.J. at p. 150) under the Fourteenth Amendment, which would confer citizenship on all persons born in the United States and imbue them with every right of citizenship, including the right to keep and bear arms. (*Ibid.*) In more recent times, Congress has continued to recognize that the right of law-abiding citizens to keep and bear arms is guaranteed by the Second and the Fourteenth Amendments. (Firearms Owners' Protection Act of 1986, Pub.L. No. 99-308 (May 19, 1986) 100 Stat. 449.)

The judiciary, too, has consistently acknowledged the interplay between express provisions and implicit protections. In *Poe v. Ullman* (1960) 367 U.S. 497 [81 S.Ct. 1752, 6 L.Ed.2d 989], the seminal case in the Supreme Court's fundamental rights jurisprudence, Justice Harlan, dissenting, argued the Fourteenth Amendment due process clause protects privacy. He claimed the due process clause covered, but was not exclusively limited to, "the precise terms of the specific guarantees elsewhere provided in the Constitution," including "freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures." (*Id.* at p. 543 [81 S.Ct. at pp. 1776-1777] (dis. opn. of Harlan, J.).) The court continues to cite Justice Harlan's enumeration as part of the full scope of liberty guaranteed by the Fourteenth Amendment against state infringement. (*Planned Parenthood of Southeastern Pa. v. Casey* (1992) 505 U.S. 833, 848-849 [112 S.Ct. 2791, 2805-2806, 120 L.Ed.2d 674]; *Roe v. Wade* (1973) 410 U.S. 113, 169 [93 S.Ct. 705, 734-735, 35 L.Ed.2d 147] (conc. opn. of Stewart, J.); *Griswold v. Connecticut* (1965) 381 U.S. 479, 499 [85 S.Ct. 1678, 1689-1690, 14 L.Ed.2d 510] (conc. opn. of Goldberg, J.).)

## II

We got it right two decades ago: "The constitutional bedrock upon which all equal protection analysis rests is composed of the insistence upon a

rational relationship between selected legislative ends and the means chosen to further or achieve them." (*Hays v. Wood, supra*, 25 Cal.3d 772, 786.) The reasoning on which we relied has even greater force now. " 'The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation.' " (*Id.* at pp. 786-787, quoting *Railway Express v. New York* (1949) 336 U.S. 106, 112-113 [69 S.Ct. 463, 466-467, 93 L.Ed. 533] (conc. opn. of Jackson, J.); Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection* (1972) 86 Harv. L.Rev. 1, 8.) It is true, of course, that even a searching equal protection analysis will not preclude all underinclusive classifications. Rational basis with bite merely requires that when a legislature addresses an area of concern "in less than comprehensive fashion by 'striking the evil where it is felt most' [citation], its decision as to where to 'strike' must have a rational basis in light of the legislative objectives." (*Hays v. Wood, supra*, 25 Cal.3d at p. 791, quoting *Werner v. Southern Cal. etc. Newspapers, supra*, 35 Cal.2d at p. 132.) The anomaly here, of course, is that those complaining of unequal treatment—gun owners and dealers—are not a powerless minority, but rather one of the most focused and well-financed interest groups in modern American politics.

Politics is the art of the possible under pressure. "Everything that emerges from the legislative forum is tainted by its journey through the lobby. And the demand for perfection must inevitably compromise with the hard facts of political life." (Tussman & tenBroek, *The Equal Protection of the Laws* (1949) 37 Cal. L.Rev. 341, 350.) The pledge of equality before the law becomes meaningless if courts routinely validate legislative acquiescence to the strongest pressure group; but democratic processes are undermined if courts exhibit zero tolerance for any deviation from the great principle of equal protection. And the toughest and most delicate of questions is how to apply the principles of equal protection in a case like this one which defies —or perhaps redefines—the paradigm. The answer does not depend on "a mechanical application of convenient formulae," but rather requires a "complex and creative act of judgment." (*Id.* at pp. 350-351.) In this narrow intersection, rational basis analysis and heightened scrutiny may look the same.

Plaintiffs complain that the ban is irrationally underinclusive. Admittedly, the Legislature's findings and declarations seem internally inconsistent.

While declaring that it banned the semiautomatic firearms listed in Penal Code section 12276 because each weapon "has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings," the Legislature goes on to declare that it does not intend "to place restrictions on the use of those weapons which are primarily designed and intended for hunting, target practice, or other legitimate sports or recreational activities." (Pen. Code, § 12275.5.) Conspicuous by its absence is any finding that the listed weapons differ from those not listed with respect to the salient characteristic, namely, their "rate of fire and capacity for firepower." (*Ibid.*)

On the other hand, plaintiff's claim that the ban is irrational because it will have no effect on violent crime proves too much. The insistence upon a rational relationship between selected legislative ends and the means chosen to further them cannot be so exacting. To declare murder a crime will not prevent murder. Prohibiting the possession of weapons by convicted felons will not stop criminals from obtaining guns. Assessing ever greater penalties has not eliminated the scourge of drug abuse. Means scrutiny assumes the law will have some effect and compares that effect with the means the Legislature has chosen.

Were courts to overturn every legislative action that is likely to be ineffective, few laws would survive. As in other spheres of human endeavor, legislative action is often fated to be more symbolic than real, and the understandable human desire to *do* something to address the crisis of the moment, not to mention the political necessity of being *seen* to be doing something, may be the real object of many legislative exercises. (See Kobayashi & Olson, *In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons"* (1997) 8 Stan. L. & Pol'y Rev. 41, 43.) And, to be fair, the most severe problems confronting us—like the current plague of violence—are quite beyond the capacity of government to cure. As Solzhenitsyn observed half a century ago, "the line separating good and evil passes not through states, nor between classes, nor between political parties either—but right through every human heart—and through all human hearts." (Solzhenitsyn, The Gulag Archipelago (1992) p. 615.)

Constitutional provisions divide into two categories: the "historically defined hard core of procedural provisions," including the Bill of Rights, the mechanics of institutional arrangements, political processes, and power allocations (Bickel, The Morality of Consent (1975) p. 29) and the "constitutional generalities" which must make it possible for future battles to be

fought and for the Constitution "to transcend and to endure beyond the fiercest political differences." (Bickel, The Least Dangerous Branch (1962) p. 105.) While the courts must enforce both, the necessary open-endedness of concepts like equal protection means judicial review has important practical limits in a democracy. Where legislative compromise is still possible under conditions which are likely to fairly reconcile competing interests, courts may decline to intervene. The court's duty to restrain the tyranny of the majority must be measured against its obligation to act prudentially and with deference to the political process. Under our regime, a court must oppose arbitrary injustice even when acts of oppression have been duly enacted, and may vouchsafe no answer though contending political forces—momentarily in equipoise—teeter on the edge of tyranny.

Here, the underinclusiveness of the statute is not an attempt to exploit a despised minority. Instead, the Legislature sought to satisfy its need to do something about gun violence without awakening the political enmity of a large and effective constituency. Gun owners may be, as amici curiae argue, "a class of people subjected . . . to vicious stereotypes," but in the political realm a vicious stereotype is a constitutional disadvantage only when it results in impotence.

### III

The issue before us may be among the most troubling and intractable of the last 30 years. Predictably, as cultural disintegration accelerates, the level of lethal violence escalates. Even cynics, quick to accuse elected officials of political posturing and empty symbolism, are stunned by the steadily mounting body count. Like the poet, we are forced to "put [our] eyes on a diet" because our "tears are gaining too much weight." (Kaufman, Golden Sardine (1967) "Heavy Water Blues," p. 60.) It is impossible not to grieve for the thousands of young men cut down in their prime; impossible not to mourn toddlers slaughtered in the midst of innocent play; impossible to ignore the grim reality of schoolchildren whose final moments echo with screams of terror and the sudden slap of bullets. And worse even than the slaughter of innocents is the death of innocence. All too often, the killers are children, too.

Some antigun advocates candidly admit they welcome " '[shooting] incidents' " and hope " 'more heinous ones with more tragic or more important victims' " will help move public opinion beyond support for narrow controls to the desired goal of complete disarmament. (Kates, *Gun Control: Separating Reality From Symbolism* (1994) 20 J. Contemp. L. 353, 358, quoting Ross, *Book Review* (1992) 98 Am. J. Soc. 661.) Amitai Etzioni, as spokesman for the Communitarian Network, dismisses the gun control measures

that have been enacted and those currently under discussion as but " 'vanilla-pale' " measures. (Kopel et al., *Communitarians, Neorepublicans, and Guns: Assessing the Case for Firearms Prohibitions* (1997) 56 Md. L.Rev. 438, 450, quoting Etzioni et al., *The Case for Domestic Disarmament* (1992) The Communitarian Network <http://www.gwu.edu/~ccps/pop_disarm.html> [as of June 5, 2000].) In Professor Etzioni's view, the only effective measure to end gun violence is domestic disarmament. (*Ibid.*) He has elsewhere argued that the right of the people to keep and bear arms (if any such right exists) is outweighed by the right of the public to be safe. (Kopel et al., at p. 445, quoting The Communitarian Network, *The Responsive Communitarian Platform: Rights and Responsibilities* reprinted in Rights and the Common Good: The Communitarian Perspective (Etzioni edit. 1995) pp. 11, 19.)

I suspect the freedmen of the Reconstruction Era would vehemently disagree. So would the Armenians facing the Ottoman Turks in 1915, the embattled Jews of the Warsaw Ghetto in 1943, and the victims of Pol Pot's killing fields.

The media keep the horrific visions of gun violence ever before our eyes. These acts of individual madness are undeniably tragic and totally unacceptable in a civilized society. But there are other horrific visions—the victims of which number in the millions—perpetrated by governments against unarmed populations.

## CONCLUSION

The framers could have had no conception of the massive scale on which government-sanctioned murder would be committed in the 20th century, but they had a keen appreciation of the peril of being defenseless. That wariness is reflected in the Constitution. Perhaps they would agree with Thomas Paine's practical observation in his article *Thoughts on Defensive War* (Paine, *Thoughts on Defensive War* (July 1775) Pennsylvania Magazine <http://www.scican.net/~jsnider/thotsdefwar.html> [as of June 13, 2000]): "I am thus far a Quaker, that I would gladly agree with all the world to lay aside the use of arms, and settle matters by negotiation: but unless the whole will, the matter ends, and I take up my musket and thank heaven . . . ."

**KENNARD, J.,** Concurring and Dissenting.—The Roberti-Roos Assault Weapons Control Act of 1989 (Pen. Code, § 12275 et seq.; hereafter the Act) bans certain semiautomatic firearms as "assault weapons," listing them by

make and model.[1] Plaintiffs' complaint alleged that many other guns not banned by the Act are identical to or functionally indistinguishable from those that are banned. According to plaintiffs, the Act draws no rational distinction between the guns that are prohibited and those that are not, thus violating state and federal constitutional guarantees of equal protection of the laws.

Unlike the majority, I agree with the Court of Appeal that plaintiffs' complaint has adequately alleged an equal protection violation and that therefore plaintiffs are entitled to present evidence in support of their allegations.

Although I disagree with the majority's rejection of plaintiffs' equal protection claim, I join fully in parts I.B. and I.C. of the majority opinion, rejecting plaintiffs' separation of powers and due process claims.

## I

On January 17, 1989, a mentally disturbed man armed with a semiautomatic rifle fired 105 rounds at a Stockton schoolyard, killing five children and wounding many others. This tragedy prompted the Legislature's passage of the Act some six months later.

In section 12275.5, the Act sets out the Legislature's intent for its ban on assault weapons: "The Legislature hereby finds and declares that the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state. The Legislature has restricted the assault weapons specified in Section 12276 based upon finding that each firearm has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings. It is the intent of the Legislature in enacting this chapter to place restrictions on the use of assault weapons and to establish a registration and permit procedure for their lawful sale and possession. It is not, however, the intent . . . to place restrictions on the use of those weapons which are primarily designed and intended for hunting, target practice, or other legitimate sports or recreational activities."

The Act defines as "assault weapons" certain semiautomatic rifles, pistols, and shotguns, listing them by manufacturer and model. (§ 12276.) It also contains a judicial "add-on" procedure allowing the Attorney General to

---

[1]All further undesignated statutory references are to the Penal Code.

petition a court to add certain other makes and models of firearms to the assault weapons list. (§ 12276.5, subd. (a)(1) and (2).)[2]

For guns classified as assault weapons, the Act makes their manufacture, distribution, import into the state, sale, or loan a felony punishable by up to eight years in state prison. (§ 12280, subd. (a)(1).) The Act also prohibits possession of such guns, an offense punishable by up to one year of imprisonment. (§ 12280, subd. (b).) But the Act has a "grandfather" provision allowing persons who owned assault weapons before June 1, 1989, or before they were judicially added to the list of assault weapons, to register them with the Department of Justice and then to have limited use of those guns. (§ 12285, subds. (a), (b)(1) and (c).)

## II

In April 1991, plaintiffs filed this action challenging the constitutionality of the Act on various grounds. The first amended complaint asserted that section 12276.5's judicial add-on procedure, which allows the Attorney General to petition a court to add certain other firearms to the assault weapons list, impermissibly assigned legislative functions to the judicial branch in violation of California Constitution, article VI, section 1. The complaint also alleged that the Act failed to provide fair warning to owners of the judicially added-on guns, thus violating principles of due process under the federal and state Constitutions (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 29). As I noted at the outset, I agree with the majority that as to either allegation plaintiffs have failed to adequately state a cause of action.

Plaintiffs' complaint also alleged violations of the equal protection guarantees of the federal and state Constitutions, contending the Act was constitutionally underinclusive because there was no rational basis for regulating the listed firearms but not regulating other identical or functionally indistinguishable guns.

The Attorney General demurred to plaintiffs' first amended complaint. The trial court sustained the demurrer and dismissed the case. The Court of Appeal reversed. This court granted the Attorney General's petition for review, which raised, among others, this issue: Does a penal statute listing

---

[2]To be added to the assault weapon list under the judicial add-on procedure, a gun must be "[a]nother model by the same manufacturer or a copy by another manufacturer" of a listed firearm (§ 12276.5, subd. (a)(1)), or a firearm first manufactured or sold in California after June 1, 1989, that had been "redesigned, renamed, or renumbered" from a listed firearm, or a firearm "manufactured or sold by another company under a licensing agreement" for one of the listed firearms (id., subd. (a)(2)).

firearms by model, type, and series, and prohibiting their possession, sale, and use, violate principles of equal protection by failing to include on the list other functionally indistinguishable firearms? The answer is "yes," as I explain below.

## III

## A

The federal Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." (U.S. Const., 14th Amend., § 1.) This provision does not create substantive rights. (*San Antonio Independent School Dist. v. Rodriguez* (1973) 411 U.S. 1, 33 [93 S.Ct. 1278, 1296-1297, 36 L.Ed.2d 16].) "Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." (*Vacco v. Quill* (1997) 521 U.S. 793, 799 [117 S.Ct. 2293, 2297, 138 L.Ed.2d 834].)

Like the federal Constitution, the California Constitution provides that "[a] person may not be . . . denied equal protection of the laws." (Cal. Const., art. I, § 7, subd. (a).)

As I stated recently in my dissenting opinion in *Warden v. State Bar* (1999) 21 Cal.4th 628, 652 [88 Cal.Rptr.2d 283, 982 P.2d 154]: "The United States Supreme Court and this court have enunciated three standards of review for deciding constitutional equal protection challenges. (See generally Tribe, American Constitutional Law (2d ed. 1988) §§ 16-32, p. 1601 et seq.) For legislation containing a 'suspect' classification, such as race, or touching upon a fundamental interest, such as voting, courts have been directed to apply strict scrutiny and to uphold the legislation only if its classification is precisely tailored to further a compelling governmental interest. [Citations.] For legislation discriminating on the basis of gender or illegitimacy, courts are to apply intermediate scrutiny and to uphold the legislation only if its classification serves an important governmental objective and is substantially related to achievement of that objective. [Citations.] Finally, when the conditions requiring either strict or intermediate scrutiny are absent, courts are to apply what is commonly called the 'rational basis' standard of review, under which challenged legislation is upheld if its classification is rationally related to a legitimate governmental purpose. [Citations.]"

Here, plaintiffs assert that the Act, when evaluated under the deferential rational basis test, violates the constitutional guarantee of equal protection of the laws. Because I conclude that plaintiffs have adequately pled an equal

protection cause of action under that standard, I do not address the applicability of any stricter test.

Although the majority and I both apply the rational basis test to this case, we reach different conclusions. I do, however, agree with the majority's general observation that the right to equal protection granted to "persons" by the federal and state Constitutions extends not just to persons but to persons' interests in things, such as plaintiffs' interests in particular firearms covered by the Act. (Maj. opn., *ante*, at pp. 479-480, in this regard disagreeing with *Benjamin v. Bailey* (1995) 234 Conn. 455 [662 A.2d 1226, 1235-1237]; and disapproving *California Rifle & Pistol Assn. v. City of West Hollywood* (1998) 66 Cal.App.4th 1302, 1326 [78 Cal.Rptr.2d 591].)

B

The United States Supreme Court has itself acknowledged that its cases applying the rational basis standard have described that standard in differing, and oftentimes conflicting, ways. (See *U.S. Railroad Retirement Bd. v. Fritz* (1980) 449 U.S. 166, 176-177, fn. 10 [101 S.Ct. 453, 460, 66 L.Ed.2d 368] ["The most arrogant legal scholar would not claim that all of [this court's rational basis] cases applied a uniform or consistent test under equal protection principles"].) But in its most recent pronouncements on the rational basis test, the high court has said this: "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." (*FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 313 [113 S.Ct. 2096, 2101, 124 L.Ed.2d 211]; accord, *Central State Univ. v. American Assn. of Univ. Professors, Central State Univ. Chapter* (1999) 526 U.S. 124, 127-128 [119 S.Ct. 1162, 1163, 143 L.Ed.2d 227] (*Central State Univ.*) [" 'a classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between disparity of treatment and some legitimate governmental purpose' "].)

The United States Supreme Court does not "require a legislature to articulate its reasons for enacting a statute, [and considers it] entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." (*FCC v. Beach Communications, Inc., supra,* 508 U.S. at p. 315 [113 S.Ct. at p. 2102]; *Nordlinger v. Hahn* (1992) 505 U.S. 1, 15 [112 S.Ct. 2326, 2334, 120 L.Ed.2d 1] [equal protection "does not demand for purposes of rational-basis

review that a legislature . . . actually articulate . . . the purpose or rationale supporting its classification"]; see also *Central State Univ., supra*, 526 U.S. at p. 129 [119 S.Ct. at p. 1164] (conc. opn. of Ginsburg, J.) ["for the mine run of economic regulations that do not trigger heightened scrutiny . . . 'the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification' "].) And the high court has said that "those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.' " (*FCC v. Beach Communications, Inc., supra*, 508 U.S. at p. 315 [113 S.Ct. at p. 2102].)

Although perhaps difficult to do, refuting every conceivable basis that might support the rationality of a legislative classification is not impossible. "[E]ven in the ordinary equal protection case calling for the most deferential of standards, [courts must ascertain] the relation between the classification adopted and the object to be attained. The search for the link between classification and objective gives substance to the Equal Protection Clause." (*Romer v. Evans* (1996) 517 U.S. 620, 632 [116 S.Ct. 1620, 1627, 134 L.Ed.2d 855].) That clause "does not forbid classifications," but it does forbid "governmental decisionmakers from treating differently persons who are in all relevant respects alike." (*Nordlinger v. Hahn, supra*, 505 U.S. at p. 10 [112 S.Ct. at p. 2331].) Thus, a statute may violate equal protection if it is underinclusive (benefiting or burdening only some members of a group of similarly situated individuals), and if there is no rational basis for its discriminatory treatment of different members of the group.

Here, the Act treats manufacturers and owners of semiautomatic firearms classified by make and model in section 12276's list of assault weapons differently from those who manufacture and own other semiautomatic firearms. Manufacturers of firearms included in the list of assault weapons cannot make or sell those guns in California. (§ 12280, subd. (a)(1).) And owners of such firearms must register them with the Department of Justice to have even limited use of their guns. (§ 12285, subds. (a) and (c).) Noncompliance with these restrictions is punishable as a felony. (§ 12280, subds. (a)(1) and (b).) But for all other semiautomatic firearms, the Act imposes no registration requirement or limitation on their manufacture, transfer, or use.

Plaintiffs' complaint alleged that the Act is unconstitutionally underinclusive because the regulated firearms are identical or functionally indistinguishable from unregulated firearms. According to the complaint, firearms covered by the Act pose no greater risk to the public than any other semiautomatic firearms, and Federal Bureau of Investigation statistics show that, in comparison to all other firearms, the guns classified in the Act's list of assault weapons are rarely used in crime. The complaint further alleged

that some of the guns not covered by the Act are actually more deadly than those classified as assault weapons, because the latter generally are designed for "down-powered military ammunition" intended to maximize wounding, not killing, in deference to the laws of war, while the former include hunting rifles, intended for killing. Plaintiffs assert that other omitted semiautomatic firearms are identical in weight or lighter than regulated guns, and shoot "similar or identical military-caliber ammunition at the same rate of fire, from magazines holding an equal number of rounds."

Because the trial court here dismissed plaintiffs' complaint without giving them the opportunity to present evidence, those allegations must be "deemed true for the limited purpose of determining whether [the] plaintiff[s] [have] stated a viable cause of action." (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 885 [66 Cal.Rptr.2d 888, 941 P.2d 1157]; *Crowley v. Katleman* (1994) 8 Cal.4th 666, 672 [34 Cal.Rptr.2d 386, 881 P.2d 1083].) Therefore, I assume the truth of plaintiffs' allegations that the semiautomatic firearms specified in the Act as assault weapons are not in any material respect different from other semiautomatic firearms that, although identical to or functionally indistinguishable from the banned guns, are not subject to the Act.

As I have explained, the constitutional principle of equal protection prohibits a law from "treating differently persons who are in all relevant respects alike." (*Nordlinger v. Hahn, supra*, 505 U.S. at p. 10 [112 S.Ct. at p. 2331]; see also *Peoples Rights Organization, Inc. v. City of Columbus* (6th Cir. 1998) 152 F.3d 522, 532-533 [invalidating on this ground the registration provision of an assault weapon law treating differently owners of functionally indistinguishable guns].) If in this case the factual allegations pleaded in plaintiffs' complaint are true, the Act violates the constitutional guarantee of equal protection of the laws by irrationally banning some but not all similar firearms. In my view, plaintiffs have adequately pleaded a cause of action alleging the Act's equal protection violation.

In rejecting plaintiffs' equal protection claim, the majority states that the Legislature could properly address the prohibition and regulation of semiautomatic firearms one step at a time, banning some now and leaving until later the decision to ban others. (Maj. opn., *ante*, at p. 488.) The majority wholly misapplies the rule it invokes, however. It fails to recognize that legislation does not automatically satisfy the constitutional guarantee of equal protection of the laws simply by addressing only part of a problem. Contrary to the majority, it is not enough that the Legislature here thought that banning some—but not all—similar guns "would make California a safer place, even if only marginally and incrementally." (*Id.* at p. 491.) Rather, the Legislature

must have some rational basis for drawing the lines that it does; it may not arbitrarily choose whom to regulate and whom to leave untouched. Not only must the legislative objective (here, a reduction in gun violence) be rational, but the classifications drawn to advance that objective (here, the division between the weapons prohibited by the Act and those it permits) must also be rational.

"[W]hen the legislative body proposes to address an area of concern in less than comprehensive fashion by 'striking the evil where it is felt most' [citation], its decision as to where to 'strike' must have a rational basis in light of the legislative objectives. The same principle was expressed by the United States Supreme Court in *Rinaldi* v. *Yeager* (1966) 384 U.S. 305 [16 L.Ed.2d 577, 86 S.Ct. 627], when it stated, at pages 308-309 [86 S.Ct. at pages 1499-1500]: 'The Equal Protection Clause requires more of a state law than nondiscriminatory application within a class it establishes. [Citation.] It also imposes a requirement of some rationality in the nature of the class singled out. . . . [T]he Equal Protection Clause does require that, in defining a class subject to legislation, the distinctions that are drawn have "some relevance to the purpose for which the classification is made." [Citations.]' " (*Hays v. Woods* (1979) 25 Cal.3d 772, 791 [160 Cal.Rptr. 102, 603 P.2d 19].)

The United States Supreme Court applied the requirement that any step-by-step approach have a rational basis for the disparities it creates in *Minnesota v. Clover Leaf Creamery Co.* (1981) 449 U.S. 456, 466 [101 S.Ct. 715, 725, 66 L.Ed.2d 659]. There, Minnesota banned plastic disposable milk containers while permitting paper ones. Relying on a full record created by "extensive evidentiary hearings" (*id.* at p. 460 [101 S.Ct. at p. 722]), the high court explained that the distinction was justified by evidence of differences in the environmental consequences of the two different types of containers. It was only because of these differences between the two types of containers, demonstrated in the evidentiary hearings, that the court concluded that "[t]he Equal Protection Clause does not deny the State of Minnesota the authority to ban one type of milk container conceded to cause environmental problems [plastic], merely because another type [paper], already established in the market, is permitted to continue in use." (*Id.* at p. 466 [101 S.Ct. at p. 725].)

Here, plaintiffs' complaint alleged that the Act discriminates between owners and makers of different models of functionally indistinguishable guns, with members of one group facing severe criminal penalties for conduct that remains completely legal for similarly situated members of the other group. The majority cites no United States Supreme Court authority upholding any similar legislative scheme, much less authority for doing so at

the pleading stage without conducting any evidentiary proceedings to resolve the merits of the issue. Just this year the high court reiterated that a complaint alleging, as does plaintiffs' complaint here, that the government has treated similarly situated persons differently and that its differential treatment is irrational and arbitrary is "sufficient to state a claim for relief under traditional equal protection analysis." (*Village of Willowbrook v. Olech* (2000) 528 U.S. 562, 565 [120 S.Ct. 1073, 1075, 145 L.Ed.2d 1060].)

In concluding that the trial court erred in dismissing plaintiffs' equal protection cause of action, I express no view on plaintiffs' likelihood of success in proving the similarities between the regulated and unregulated semiautomatic firearms. At this juncture, I conclude only that plaintiffs have alleged sufficient facts at the pleading stage permitting them to go forward on their equal protection claim.

CONCLUSION

Because of all-too-frequent tragic instances of gun violence, such as the Stockton schoolyard massacre that prompted the Legislature's 1989 enactment of the Roberti-Roos Assault Weapons Control Act at issue here, many in our society see the need for strict gun control. Others oppose all firearm regulation, believing that it threatens what the United States Supreme Court has called the "long tradition of widespread lawful gun ownership by private individuals in this country." (*Staples v. United States* (1994) 511 U.S. 600, 610 [114 S.Ct. 1793, 1799, 128 L.Ed.2d 608].) That public debate on gun policy is not before us here.

Californians who are divided on the need for strict gun control are generally united in supporting the constitutional principle of equal protection—that the government should treat similar cases alike, free of arbitrary or invidious distinctions. Here, plaintiffs have alleged that the Act, which bans some semiautomatic weapons but not others, lacks any rational basis for its choice of the guns that are subject to its requirements. At this early stage of the litigation, those allegations are sufficient, and plaintiffs should now be given the opportunity to prove, if they can, what they have so far only alleged. Unlike the majority, I would grant them this opportunity.

Appellants' petition for a rehearing was denied August 16, 2000. Kennard, J., was of the opinion that the petition should be granted.

APPENDIX[1]

## § 12275. Short title

This chapter shall be known as the Roberti-Roos Assault Weapons Control Act of 1989. (Added by Stats.1989, c. 19, § 3.)

## § 12275.5. Legislative findings and declarations

The Legislature hereby finds and declares that the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state. The Legislature has restricted the assault weapons specified in Section 12276 based upon finding that each firearm has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings. It is the intent of the Legislature in enacting this chapter to place restrictions on the use of assault weapons and to establish a registration and permit procedure for their lawful sale and possession. It is not, however, the intent of the Legislature by this chapter to place restrictions on the use of those weapons which are primarily designed and intended for hunting, target practice, or other legitimate sports or recreational activities.
(Added by Stats.1989, c. 19, § 3.)

## § 12276. Assault weapon

As used in this chapter, "assault weapon" shall mean the following designated semiautomatic firearms:
(a) All of the following specified rifles:
(1) All AK series including, but not limited to, the models identified as follows:
(A) Made in China AK, AKM, AKS, AK47, AK47S, 56, 56S, 84S, and 86S.
(B) Norinco 56, 56S, 84S, and 86S.
(C) Poly Technologies AKS and AK47.
(D) MAADI AK47 and ARM.
(2) UZI and Galil.
(3) Beretta AR-70.
(4) CETME Sporter.
(5) Colt AR-15 series.
(6) Daewoo K-1, K-2, Max 1, Max 2, AR 100, and AR 110C.
(7) Fabrique Nationale FAL, LAR, FNC, 308 Match, and Sporter.

---

[1]Derived from West's Annotated Penal Code (CD-Rom, Jan. 2000).

(8) MAS 223.

(9) HK-91, HK-93, HK-94, and HK-PSG-1.

(10) The following MAC types:

(A) RPB Industries Inc. sM10 and sM11.

(B) SWD Incorporated M11.

(11) SKS with detachable magazine.

(12) SIG AMT, PE-57, SG 550, and SG 551.

(13) Springfield Armory BM59 and SAR-48.

(14) Sterling MK-6.

(15) Steyer AUG.

(16) Valmet M62S, M71S, and M78S.

(17) Armalite AR-180.

(18) Bushmaster Assault Rifle.

(19) Calico M-900.

(20) J&R ENG M-68.

(21) Weaver Arms Nighthawk.

(b) All of the following specified pistols:

(1) UZI.

(2) Encom MP-9 and MP-45.

(3) The following MAC types:

(A) RPB Industries Inc. sM10 and sM11.

(B) SWD Incorporated M-11.

(C) Advance Armament Inc. M-11.

(D) Military Armament Corp. Ingram M-11.

(4) Intratec TEC-9.

(5) Sites Spectre.

(6) Sterling MK-7.

(7) Calico M-950.

(8) Bushmaster Pistol.

(c) All of the following specified shotguns:

(1) Franchi SPAS 12 and LAW 12.

(2) Striker 12.

(3) The Streetsweeper type S/S Inc. SS/12.

(d) Any firearm declared by the court pursuant to Section 12276.5 to be an assault weapon that is specified as an assault weapon in a list promulgated pursuant to Section 12276.5.

(e) The term "series" includes all other models that are only variations, with minor differences, of those models listed in subdivision (a), regardless of the manufacturer.

(f) This section is declaratory of existing law, as amended, and a clarification of the law and the Legislature's intent which bans the weapons enumerated in this section, the weapons included in the list promulgated by the Attorney General pursuant to Section 12276.5, and any other models which

are only variations of those weapons with minor differences, regardless of the manufacturer. The Legislature has defined assault weapons as the types, series, and models listed in this section because it was the most effective way to identify and restrict a specific class of semiautomatic weapons.

(Added by Stats.1989, c. 19, § 3. Amended by Stats.1991, c. 954 (S.B.263), § 2.)

(Amended by Stats.1992, c. 427 (A.B.3355), § 134; Stats.1993, c. 606 (A.B.166), § 19 eff. Oct. 1, 1993.)

## § 12276.1. Assault weapon; further definition

(a) Notwithstanding Section 12276, "assault weapon" shall also mean any of the following:

(1) A semiautomatic, centerfire rifle that has the capacity to accept a detachable magazine and any one of the following:

(A) A pistol grip that protrudes conspicuously beneath the action of the weapon.

(B) A thumbhole stock.

(C) A folding or telescoping stock.

(D) A grenade launcher or flare launcher.

(E) A flash suppressor.

(F) A forward pistol grip.

(2) A semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds.

(3) A semiautomatic, centerfire rifle that has an overall length of less than 30 inches.

(4) A semiautomatic pistol that has the capacity to accept a detachable magazine and any one of the following:

(A) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer.

(B) A second handgrip.

(C) A shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning his or her hand, except a slide that encloses the barrel.

(D) The capacity to accept a detachable magazine at some location outside of the pistol grip.

(5) A semiautomatic pistol with a fixed magazine that has the capacity to accept more than 10 rounds.

(6) A semiautomatic shotgun that has both of the following:

(A) A folding or telescoping stock.

(B) A pistol grip that protrudes conspicuously beneath the action of the weapon, thumbhole stock, or vertical handgrip.

(7) A semiautomatic shotgun that has the ability to accept a detachable

magazine.

(8) Any shotgun with a revolving cylinder.

(b) "Assault weapon" does not include any antique firearm.

(c) The following definitions shall apply under this section:

(1) "Magazine" shall mean any ammunition feeding device.

(2) "Capacity to accept more than 10 rounds" shall mean capable of accommodating more than 10 rounds, but shall not be construed to include a feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds.

(3) "Antique firearm" means any firearm manufactured prior to January 1, 1899.

(d) This section shall become operative January 1, 2000.

(Added by Stats.1999, c. 129 (S.B.23), § 7, operative Jan. 1, 2000.)

### § 12276.5. Temporary suspension of manufacture, sale, distribution, transportation, importation, or lending of alleged assault weapon; distribution of description

(a) Upon request by the Attorney General filed in a verified petition in a superior court of a county with a population of more than 1,000,000, the superior court shall issue a declaration of temporary suspension of the manufacture, sale, distribution, transportation, or importation into the state, or the giving or lending of a firearm alleged to be an assault weapon within the meaning of Section 12276 because the firearm is either of the following:

(1) Another model by the same manufacturer or a copy by another manufacturer of an assault weapon listed in subdivision (a), (b), or (c) of Section 12276 which is identical to one of the assault weapons listed in those subdivisions except for slight modifications or enhancements including, but not limited to: a folding or retractable stock; adjustable sight; case deflector for left-handed shooters; shorter barrel; wooden, plastic or metal stock; larger magazine size; different caliber provided that the caliber exceeds .22 rimfire; or bayonet mount. The court shall strictly construe this paragraph so that a firearm which is merely similar in appearance but not a prototype or copy cannot be found to be within the meaning of this paragraph.

(2) A firearm first manufactured or sold to the general public in California after June 1, 1989, which has been redesigned, renamed, or renumbered from one of the firearms listed in subdivision (a), (b), or (c) of Section 12276, or which is manufactured or sold by another company under a licensing agreement to manufacture or sell one of the firearms listed in subdivision (a), (b), or (c) of Section 12276, regardless of the company of production or distribution, or the country of origin.

(b) Upon the issuance of a declaration of temporary suspension by the superior court and after the Attorney General has completed the notice

requirements of subdivisions (c) and (d), the provisions of subdivision (a) of Section 12280 shall apply with respect to those weapons.

(c) Upon declaration of temporary suspension, the Attorney General shall immediately notify all police, sheriffs, district attorneys, and those requesting notice pursuant to subdivision (d), shall notify industry and association publications for those who manufacture, sell, or use firearms, and shall publish notice in not less than 10 newspapers of general circulation in geographically diverse sections of the state of the fact that the declaration has been issued.

(d) The Attorney General shall maintain a list of any persons who request to receive notice of any declaration of temporary suspension and shall furnish notice under subdivision (c) to all these persons immediately upon a superior court declaration. Notice shall also be furnished by the Attorney General by certified mail, return receipt requested (or substantial equivalent if the person who is to receive the notice resides outside the United States), to any known manufacturer and California distributor of the weapon which is the subject of the temporary suspension order or their California statutory agent for service. The notice shall be deemed effective upon mailing.

(e) After issuing a declaration of temporary suspension under this section, the superior court shall set a date for hearing on a permanent declaration that the weapon is an assault weapon. The hearing shall be set no later than 30 days from the date of issuance of the declaration of temporary suspension. The hearing may be continued for good cause thereafter. Any manufacturer or California distributor of the weapon which is the subject of the temporary suspension order has the right, within 20 days of notification of the issuance of the order, to intervene in the action. Any manufacturer or California distributor who fails to timely exercise its right of intervention, or any other person who manufactures, sells, or owns the assault weapon may, in the court's discretion, thereafter join the action as amicus curiae.

(f) At the hearing, the burden of proof is upon the Attorney General to show by a preponderance of evidence that the weapon which is the subject of the declaration of temporary suspension is an assault weapon. If the court finds the weapon to be an assault weapon, it shall issue a declaration that it is an assault weapon under Section 12276. Any party to the matter may appeal the court's decision. A declaration that the weapon is an assault weapon shall remain in effect during the pendency of the appeal unless ordered otherwise by the appellate court.

(g) The Attorney General shall prepare a description for identification purposes, including a picture or diagram, of each assault weapon listed in Section 12276, and any firearm declared to be an assault weapon pursuant to this section, and shall distribute the description to all law enforcement agencies responsible for enforcement of this chapter. Those law enforcement agencies shall make the description available to all agency personnel.

(h) The Attorney General shall promulgate a list that specifies all firearms designated as assault weapons in Section 12276 or declared to be assault weapons pursuant to this section. The Attorney General shall file that list with the Secretary of State for publication in the California Code of Regulations. Any declaration that a specified firearm is an assault weapon shall be implemented by the Attorney General who, within 90 days, shall promulgate an amended list which shall include the specified firearm declared to be an assault weapon. The Attorney General shall file the amended list with the Secretary of State for publication in the California Code of Regulations. Chapter 3.5 (commencing with Section 11340) of Division 3 of Title 2 of the Government Code, pertaining to the adoption of rules and regulations, shall not apply to any list of assault weapons promulgated pursuant to this section.

(i) The Attorney General shall adopt those rules and regulations that may be necessary or proper to carry out the purposes and intent of this chapter. (Added by Stats.1989, c. 19, § 3. Amended by Stats.1990, c. 874 (S.B.2444), § 1; Stats.1991, c. 954 (S.B.263), § 3.)

### § 12277. Person

As used in this chapter, "person" means an individual, partnership, corporation, limited liability company, association, or any other group or entity, regardless of how it was created. (Added by Stats.1989, c. 19, § 3.) (Amended by Stats.1994, c. 1010 (S.B.2053), § 201.)

### § 12280. Manufacture, distribution, transportation, importation, sale, possession, or lending of assault weapon; punishment; commission of other crime; exceptions

(a)(1) Any person who, within this state, manufactures or causes to be manufactured, distributes, transports, or imports into the state, keeps for sale, or offers or exposes for sale, or who gives or lends any assault weapon, except as provided by this chapter, is guilty of a felony, and upon conviction shall be punished by imprisonment in the state prison for four, six, or eight years.

(2) In addition and consecutive to the punishment imposed under paragraph (1), any person who transfers, lends, sells, or gives any assault weapon to a minor in violation of paragraph (1) shall receive an enhancement of one year.

(b) Except as provided in Section 12288, and in subdivisions (c) and (d), any person who, within this state, possesses any assault weapon, except as provided in this chapter, is guilty of a public offense and upon conviction

shall be punished by imprisonment in the state prison, or in a county jail, not exceeding one year. However, if the person presents proof that he or she lawfully possessed the assault weapon prior to June 1, 1989, or prior to the date it was specified as an assault weapon, and has since either registered the firearm and any other lawfully obtained firearm specified by Section 12276 or 12276.5 pursuant to Section 12285 or relinquished them pursuant to Section 12288, a first-time violation of this subdivision shall be an infraction punishable by a fine of up to five hundred dollars ($500), but not less than three hundred fifty dollars ($350), if the person has otherwise possessed the firearm in compliance with subdivision (c) of Section 12285. In these cases, the firearm shall be returned unless the court finds in the interest of public safety, after notice and hearing, that the assault weapon should be destroyed pursuant to Section 12028.

(c) A first-time violation of subdivision (b) shall be an infraction punishable by a fine of up to five hundred dollars ($500), if the person was found in possession of no more than two firearms in compliance with subdivision (c) of Section 12285 and the person meets all of the following conditions:

(1) The person proves that he or she lawfully possessed the assault weapon prior to the date it was defined as an assault weapon pursuant to Section 12276.1.

(2) The person is not found in possession of a firearm specified as an assault weapon pursuant to Section 12276 or Section 12276.5.

(3) The person has not previously been convicted of violating this section.

(4) The person was found to be in possession of the assault weapons within one year following the end of the one-year registration period established pursuant to subdivision (a) of Section 12285.

(5) The person has since registered the firearms and any other lawfully obtained firearms defined by Section 12276.1, pursuant to Section 12285, except as provided for by this section, or relinquished them pursuant to Section 12288.

(d) Firearms seized pursuant to subdivision (c) shall be returned unless the court finds in the interest of public safety, after notice and hearing, that the assault weapon should be destroyed pursuant to Section 12028.

(e) Notwithstanding Section 654 or any other provision of law, any person who commits another crime while violating this section may receive an additional, consecutive punishment of one year for violating this section in addition and consecutive to the punishment, including enhancements, which is prescribed for the other crime.

(f) Subdivisions (a) and (b) shall not apply to the sale to, purchase by, or possession of assault weapons by the Department of Justice, police departments, sheriffs' offices, marshals' offices, the Youth and Adult Corrections Agency, the Department of the California Highway Patrol, district attorneys' offices, Department of Fish and Game, Department of Parks and Recreation,

or the military or naval forces of this state or of the United States for use in the discharge of their official duties.

(g) Subdivision (b) shall not prohibit the possession or use of assault weapons by sworn peace officer members of those agencies specified in subdivision (f) for law enforcement purposes, whether on or off duty.

(h) Subdivisions (a) and (b) shall not prohibit the sale or transfer of assault weapons by an entity specified in subdivision (f) to a person, upon retirement, who retired as a sworn officer from that entity.

(i) Subdivision (b) shall not apply to the possession of an assault weapon by a retired peace officer who received that assault weapon pursuant to subdivision (h).

(j) Subdivision (b) shall not apply to the possession of an assault weapon, as defined in Section 12276, by any person during the 1990 calendar year, during the 90-day period immediately after the date it was specified as an assault weapon pursuant to Section 12276.5, or during the one-year period after the date it was defined as an assault weapon pursuant to Section 12276.1, if all of the following are applicable:

(1) The person is eligible under this chapter to register the particular assault weapon.

(2) The person lawfully possessed the particular assault weapon described in paragraph (1) prior to June 1, 1989, if the weapon is specified as an assault weapon pursuant to Section 12276, or prior to the date it was specified as an assault weapon pursuant to Section 12276.5, or prior to the date it was defined as an assault weapon pursuant to Section 12276.1.

(3) The person is otherwise in compliance with this chapter.

(k) Subdivisions (a) and (b) shall not apply to the manufacture by persons who are issued permits pursuant to Section 12287 of assault weapons for sale to the following:

(1) Exempt entities listed in subdivision (f).

(2) Entities and persons who have been issued permits pursuant to Section 12286.

(3) Entities outside the state who have, in effect, a federal firearms dealer's license solely for the purpose of distribution to an entity listed in paragraphs (4) to (6), inclusive.

(4) Federal military and law enforcement agencies.

(5) Law enforcement and military agencies of other states.

(6) Foreign governments and agencies approved by the United States State Department.

(l) Subdivision (a) shall not apply to a person who is the executor or administrator of an estate that includes an assault weapon registered under Section 12285 or that was possessed pursuant to subdivision (g) or (i) which is disposed of as authorized by the probate court, if the disposition is otherwise permitted by this chapter.

(m) Subdivision (b) shall not apply to a person who is the executor or administrator of an estate that includes an assault weapon registered under Section 12285 or that was possessed pursuant to subdivision (g) or (i), if the assault weapon is possessed at a place set forth in paragraph (1) of subdivision (c) of Section 12285 or as authorized by the probate court.

(n) Subdivision (a) shall not apply to:

(1) A person who lawfully possesses and has registered an assault weapon pursuant to this chapter who lends that assault weapon to another if all the following apply:

(A) The person to whom the assault weapon is lent is 18 years of age or over and is not in a class of persons prohibited from possessing firearms by virtue of Section 12021 or 12021.1 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.

(B) The person to whom the assault weapon is lent remains in the presence of the registered possessor of the assault weapon.

(C) The assault weapon is possessed at any of the following locations:

(i) While on a target range that holds a regulatory or business license for the purpose of practicing shooting at that target range.

(ii) While on the premises of a target range of a public or private club or organization organized for the purpose of practicing shooting at targets.

(iii) While attending any exhibition, display, or educational project that is about firearms and that is sponsored by, conducted under the auspices of, or approved by a law enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms.

(2) The return of an assault weapon to the registered possessor which is lent by the same pursuant to paragraph (1).

(o) Subdivision (b) shall not apply to the possession of an assault weapon by a person to whom an assault weapon is lent pursuant to subdivision (n).

(p) Subdivisions (a) and (b) shall not apply to the possession and importation of an assault weapon into this state by a nonresident if all of the following conditions are met:

(1) The person is attending or going directly to or coming directly from an organized competitive match or league competition that involves the use of an assault weapon.

(2) The competition or match is conducted on the premises of one of the following:

(i) A target range that holds a regulatory or business license for the purpose of practicing shooting at that target range.

(ii) A target range of a public or private club or organization that is organized for the purpose of practicing shooting at targets.

(3) The match or competition is sponsored by, conducted under the auspices of, or approved by, a law enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about,

firearms.

(4) The assault weapon is transported in accordance with Section 12026.1 or 12026.2.

(5) The person is 18 years of age or over and is not in a class of persons prohibited from possessing firearms by virtue of Section 12021 or 12021.1 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.

(q) Subdivision (b) shall not apply to any of the following persons:

(1) A person acting in accordance with Section 12286.

(2) A person who has a permit to possess an assault weapon issued pursuant to Section 12286 when he or she is acting in accordance with Section 12285 or 12286.

(r) Subdivisions (a) and (b) shall not apply to any of the following persons:

(1) A person acting in accordance with Section 12285.

(2) A person acting in accordance with Section 12286 or 12290.

(s) Subdivision (b) shall not apply to the registered owner of an assault weapon possessing that firearm in accordance with subdivision (c) of Section 12285.

(t) Subdivision (a) shall not apply to the importation into this state of an assault weapon by the registered owner of that assault weapon, if it is in accordance with the provisions of subdivision (c) of Section 12285.

(u) As used in this chapter, the date a firearm is an assault weapon is the earliest of the following:

(1) The effective date of an amendment to Section 12276 that adds the designation of the specified firearm.

(2) The effective date of the list promulgated pursuant to Section 12276.5 that adds or changes the designation of the specified firearm.

(3) The operative date of Section 12276.1, as specified in subdivision (b) of that section.

(Added by Stats.1989, c. 19, § 3. Amended by Stats.1989, c. 959, § 1; Stats.1990, c. 177 (S.B.830), § 5, eff. June 27, 1990; Stats.1990, c. 653 (S.B.2480), § 2; Stats.1991, c. 952 (A.B.1904), § 4; Stats.1991, c. 954 (S.B.263), § 4.5.).

(Amended by Stats.1992, c. 1326 (A.B.3552), § 13; Gov.Reorg.Plan No. 1 of 1995, § 51, eff. July 12, 1995; Stats.1996, c. 305 (A.B.3103), § 52; Stats.1999, c. 129 (S.B.23), § 8.)